Robert J. JEFFREYS, Jr., d/b/a Jeffreys
Flex–Flow Restrictor Company,
Plaintiff,

v.

Gerald M. EXTEN, et al., Defendants.

Civ. A. No. 86–32 LON.

United States District Court,
D. Delaware.

Jan. 15, 1992.

Richard F. Stokes of Tunnell & Raysor, Georgetown, Del. (Elliott D. Goldberg of Goldberg & Ramsay, Paoli, Pa., of counsel), for plaintiff.

Richard E. Berl, Jr. of Griffin & Hackett, Georgetown, Del., William B. Wilgus, Millsboro, Del., for defendants Exten and Topside Marina Limited Partnership.

Bayard J. Snyder of Snyder, Schlecker & Isaacs, Wilmington, Del. (David H. Moskowitz, Devon, Pa., of counsel), for defendants John Nucci, Sally Nucci, N.W., Inc. and Flights End Limited Partnership.

Michael J. Isaacs of Snyder, Schlecker & Isaacs, Wilmington, Del. (Charles E. Haller, Jr., Stuart, Fla., of counsel), for defendant Goldstein.

Richard H. May of Young, Conaway, Stargatt & Taylor, Wilmington, Del. (Peter H. Gunst of Frank, Bernstein, Conaway & Goldman, Baltimore, Md., of counsel), for Old Court Savings & Loan Ass'n, Inc. and O.C. Flights, Inc.

William M. Chasanov of Brown, Shiels & Chasanov, Georgetown, Del., for defendant Tsoukalas.

## OPINION

LONGOBARDI, Chief Judge.

The instant action alleges a multi-party scheme to defraud in violation of several provisions of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.*, Delaware's Fraudulent Conveyances Act, 6 Del.C. § 1301 *et seq.*, and common law fraud. Defendants Gary Goldstein, John Nucci and Sally Nucci have each brought a motion to dismiss on the ground that this Court lacks personal jurisdiction over them. Defendants Old Court Savings and Loan and O.C. Flights, Inc. have each brought a motion for summary judgment on the grounds that Plaintiff has failed to state a proper RICO fraud claim. Defendants John and Sally Nucci, Flight's End, Inc. and W.N., Inc. have filed a motion for summary judgment on the grounds that Plaintiff has failed to state proper non-RICO claims, that Plaintiff lacks standing to bring the RICO claims, Plaintiff has failed to state a proper RICO enterprise and that Plaintiff has failed to allege that Sally Nucci was "substantially" involved in the RICO action.

## I.  FACTS

The events giving rise to the present lawsuit began on July 1, 1974, when Defendant Gerald M. Exten and a corporation controlled by him, Exten Associates, Inc., filed for bankruptcy under Chapter XI of the Bankruptcy Act.  11 U.S.C. §§ 701–799 (1976).  At the time of the filing, Exten Associates, Inc. owned and operated a restaurant and property called Murray's Topside Restaurant and Marina (the "Topside Restaurant") located in Ocean View, Delaware, and an adjacent fourteen acre parcel located in White's Creek, Delaware (the "Marina Property").

On July 11, 1975, the Bankruptcy Court confirmed a plan of arrangement providing for the payment of creditor's claims through a mortgage on the Topside Restaurant property.  On September 3, 1976, Defendant Exten formed GAC Limited Partnership ("GAC") with himself as general partner and Gary Goldstein, Alvin Pomerantz, Charles Tatelbaum and Exten Associates, Inc. as limited partners.  Shortly thereafter, Exten Associates, Inc. conveyed the Topside Restaurant and property to GAC and GAC leased the restaurant business back to Exten Associates.  On February 16, 1977, Gerald Exten formed Topside Corporation.  Exten was the president and majority stockholder and Goldstein, his attorney, was general counsel, an officer and a stockholder.  After the formation of Topside Corporation, GAC terminated its restaurant operating lease with Exten Associates and executed a new lease in favor of Topside Corporation.

On August 28, 1978, several creditors in the Exten Associates, Inc. bankruptcy action filed a motion in Bankruptcy Court seeking to have the reorganization proceedings converted into a straight liquidation.  The creditors argued that since the arrangement plan was confirmed in 1975, Exten Associates, Inc. had failed to prepare or record a mortgage on the Topside Restaurant property in accordance with the terms of the plan and had not paid any creditors.  A hearing on the matter was held on November 7, 1978.

After the hearing but prior to the Bankruptcy Court's decision, Exten formed a real estate limited partnership known as Topside Marina Limited Partnership ("TMLP").  Topside Corporation and Gerald Exten were general partners in TMLP and collectively possessed a 23% interest in the limited partnership.  Defendant John Nucci, who along with his wife and several of his friends, were limited partners.  John Nucci was also designated as an "alternate" general partner who would conduct TMLP's affairs in the event that Exten was unable to do so.

On December 29, 1978, the Bankruptcy Court entered an order converting the Exten Associates Inc.'s Chapter XI reorganization into a Chapter VII liquidation.  Prior to the conversion, however, Exten allegedly induced the mortgagee of the Marina Property to undertake a foreclosure sale.  The purchaser at the foreclosure sale held after the Bankruptcy Court's December 29, 1978, conversion order was Defendant TMLP.

In February of 1980, a fire destroyed the Topside Restaurant.  After the fire, Exten decided to construct a new restaurant on the adjacent Marina Property.  On June 14, 1980, Plaintiff entered into a loan agreement with Exten and Topside in the amount of $100,000 for the express purpose of constructing the new restaurant.[1]  The loan was secured by a note, a pledge of all of Exten's stock in Topside, which corresponded to approximately 79.4% of the issued and outstanding stock in the corporation, and a financing statement pertaining to the equipment and furniture of the restaurant.

Listed among the assets of Topside Corporation at the time of the loan agreement was an account receivable of $575,000 in fire insurance proceeds from the original Topside Restaurant and Topside Corporation's interest in TMLP.  The land had allegedly been appraised at $1,200,000 so Topside's 23% interest at that time would have been worth approximately $276,000.  The fire insurance proceeds and the real estate interest comprised $851,000 of the

---

1.  The loan amount was later increased to $167,-  739.15 on May 16, 1982.

$1,328,300 in listed corporate assets at the time of the loan. Unknown to Plaintiff at the time of the loan, however, under the policy of insurance issued to Topside Corporation, GAC was named as mortgagee and both GAC and Topside had submitted claims to the insurer. The proceeds of the policy had then been assigned by Topside and GAC to Maryland National Bank to be applied to a 1976 chattel loan to GAC. Consequently, other than the value of the restaurant operating lease, Topside Corporation's only real asset at the time of Plaintiff's loan to Topside and Exten was Topside's real estate interest in TMLP.

On September 3, 1980, the Trustee in the Exten Associates, Inc. bankruptcy case filed a complaint in Bankruptcy Court seeking to set aside the various conveyances that took place after the 1975 confirmation. *See Matter of Exten Associates, Inc.*, 13 B.R. 818, 820 (Bankr.D.Md.1981). In the complaint, the Trustee alleged that Exten Associates' failure to provide the Topside Restaurant mortgage enabled it to engage in a series of post-confirmation transactions that were designed to defraud its creditors. In particular, the trustee sought to set aside the conveyance of the old Topside Restaurant business and property to GAC, the Sheriff's Sale of the Marina Property to TMLP, the conveyance of the restaurant operating lease from GAC to Topside and the conveyance of fire insurance proceeds from GAC and Topside to Maryland National Bank.

On October 7, 1982, Exten, Goldstein, Nucci, Topside, TMLP and GAC entered into a settlement agreement with the bankruptcy trustee under which Topside and TMLP would pay in three installments a total of $500,000.[2] On February 2, 1983, Exten, as general partner of TMLP, executed a $1,575,000 mortgage on the Marina Property with Old Court Savings and Loan. Of this amount, approximately $630,000 was used to pay off two prior mortgages on the Marina Property, $500,000 was used to pay the bankruptcy trustee and $220,000 was placed in an escrow account to fund

the first year's interest on the new mortgage. The remainder was consumed in fees or expenses although a minor sum was used for improvements on the Marina Property. Gary Goldstein acted as counsel for both Old Court and TMLP and received $20,000 in attorneys fees for his services.

In December of 1983, Plaintiff brought suit in Delaware Superior Court against Topside Corporation for nonpayment of the $167,000 debt. Plaintiff won a default judgment against Topside on January 1, 1984, in the amount of $259,933.79. That same month, Flight's End Limited Partnership ("Flight's End") was organized with W.N., Inc. ("W.N.") and O.C. Flights, Inc. ("O.C. Flights") as general partners and John Nucci and O.C. Flights as limited partners. O.C. Flights was incorporated on January 17, 1984, by Gary Goldstein who initially held all outstanding shares and was the sole officer and director of the corporation. Goldstein later assigned all outstanding and issued shares of O.C. Flights to Old Court Joint Venture, Inc. and then resigned as officer and director of O.C. Flights. W.N. was incorporated by John Nucci on January 17, 1984. Nucci was the sole stockholder, officer and director of the corporation.

On February 9, 1984, Flight's End entered into a $2,330,000 purchase money mortgage with Old Court Savings Loan for the purpose of acquiring approximately 9.4 acres of the Marina Property. Of this amount, $1,597,589.97 was used to pay off the previous loan made by Old Court and $120,240 went toward fees and settlement expenses. On December 5, 1984, TMLP conveyed the 5.1 acres, including the new Topside Restaurant and restaurant business to Nicholas Tsoukalas. In exchange for the sale, TMLP received back a $615,000 purchase money mortgage. Approximately one month later, Exten assigned the proceeds of the mortgage to Shenandoah Federal Savings & Loan Association for $450,000.

---

**2.** Although Topside and TMLP were primarily liable on the debt, the bankruptcy trustee also required that Exten, Goldstein, Nucci and their respective wives personally guarantee the various installments.

On October 10, 1986, TMLP and Shenandoah Federal Savings & Loan foreclosed on the 5.1 acres, Tsoukalas having defaulted in the interim. On October 16, 1986, Tengees Ltd., a real estate limited partnership formed by Exten, entered into a $855,000 purchase money mortgage with Shenandoah. The purpose of the loan was to allow Exten and Nucci, who were co-guarantors of the loan, to acquire the 5.1 acres for resale. After Tengees defaulted on the mortgage obligation, Shenandoah instituted foreclosure proceedings and reacquired the property on January 13, 1988.

After the conveyance to Tsoukalas but prior to the foreclosure action, Plaintiff filed the instant action on January 21, 1986, alleging violations of RICO, Delaware's Fraudulent Conveyances Act and common law fraud. Plaintiff's allegations, since refined in later pleadings, are that the various Defendants engaged in a complex "shell" game of shifting assets and intentionally defaulting on loan obligations for the purpose of defrauding creditors. In particular Plaintiff contends that the various Defendants engaged in a fraudulent scheme where they would: (1) intentionally default on mortgage encumbrances and debts to creditors to force a foreclosure sale; (2) during the pendency of the foreclosure action, form new "shell" entities; (3) at the foreclosure sale, the new "shell" entity would purchase the underlying land, eliminating all prior liens and encumbrances and facilitating clear and marketable title; (4) enter into construction loans or other financing commitments; (5) divert the proceeds for own personal benefit; and (6) after exhausting all available funds, the "shell" entity would default thus setting the stage for new foreclosure proceeding.

## II.  DISCUSSION

### A.  Personal Jurisdiction

In the case *sub judice,* the subject matter jurisdiction of the Court is premised upon alleged violations of the Racketeer and Corrupt Organizations Act ("RICO"). 18 U.S.C. § 1961, *et seq.* Because subject matter jurisdiction is based upon a federal question, the Court may exercise personal jurisdiction over individual defendants on the basis of either the jurisdictional provisions contained in the RICO statute or Delaware's long-arm statute. *See, e.g., Combs v. Bakker,* 886 F.2d 673, 675 (4th Cir.1989). Section 1965(b) of the RICO statute provides that a RICO action may be brought in any District Court of the United States so long as the "ends of justice" require it. 18 U.S.C. § 1965(b). *See also Butcher's Union Local No. 498 v. SDC Inv., Inc.,* 788 F.2d 535, 538–39 (9th Cir. 1986). Section 1965(b) is a nationwide service provision that authorizes service by United States Marshals on defendants in other judicial districts. *See Farmers Bank of State of Delaware v. Bell Mortgage Corp.,* 577 F.Supp. 34, 35 (D.Del.1978).

Because Plaintiff chose not to pursue this option, the Court must now determine whether the exercise of personal jurisdiction in this case is appropriate under the provisions of Delaware's long-arm statute. *Max Daetwyler Corp. v. R. Meyer,* 762 F.2d 290, 295–96 (3rd Cir.), *cert. denied,* 474 U.S. 980, 106 S.Ct. 383, 88 L.Ed.2d 336 (1985). *See also* Fed.R.Civ.P. 4(e).[3] Under Delaware law, determining *in personam* jurisdiction is a two-step process. First, the Court must resolve whether a defendant's asserted conduct falls within one of the enumerated categories establishing jurisdiction under Delaware's long-arm statute. Second, if the statute applies, the Court must then decide whether such service comports with traditional notions of fair play and substantial justice under the due process clause. *See U.S. v. Consolidated Rail Corp.,* 674 F.Supp. 138, 142 (D.Del.1987). *See generally Max Daetwyler Corp.,* 762 F.2d at 298–99; *DeJames v. Magnificence Carriers, Inc.,* 654 F.2d 280,

---

**3.** Rule 4(e) provides in a pertinent part:
Whenever a statute or rule of court of the state in which the district court is held provides (1) for the service of a summons, or a notice, or of an order in lieu of summons upon a party not an inhabitant of or found within the state, ... service may ... be made under the circumstances and in the manner prescribed in the statute or rule.
Fed.R.Civ.P. 4(e).

283–85 (3rd Cir.), *cert. denied,* 454 U.S. 1085, 102 S.Ct. 642, 70 L.Ed.2d 620 (1981).

The Delaware long-arm statute, 10 Del.C. § 3104, provides in a pertinent part that:

(c) As to a cause of action brought by a person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or his personal representative, who in person or through an agent:

(1) Transacts any business or performs any character of work or service in the State;

(2) Contracts to supply services or things in this State;

(3) Causes tortious injury in the State by an act or omission in this State;

(4) Causes tortious injury in this State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State;

(5) Has an interest in, uses or possesses real property in the State; or

(6) Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation or agreement located, executed or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

Under this statute, Delaware courts have consistently held that personal jurisdiction may be asserted over a nonresident defendant on the basis of a "single act" related to Delaware if the resulting claim has its basis in the asserted transaction. *Blue Ball Properties v. McClain,* 658 F.Supp. 1310, 1316 (D.Del.1987). In addition, Delaware courts have construed the statute as conferring jurisdiction to the maximum parameters of the due process clause, *Transportes Aereos De Angola v. Ronair, Inc.,* 544 F.Supp. 858 (D.Del.1982); *Wilmington Supply Co. v. Worth Plumbing & Heating,* 505 F.Supp. 777, 780 (D.Del.1980), and will liberally interpret the statute in favor of exercising jurisdiction. *Waters v. Deutz Corp.,* Del.Super., 460 A.2d 1332 (1983).

When personal jurisdiction is challenged by a motion to dismiss, the plaintiff has the initial burden of demonstrating a basis for long-arm jurisdiction. This burden is met by a *prima facie* showing that jurisdiction is conferred by the statute. In addition, all allegations of jurisdictional fact made by a plaintiff are presumed to be true and all factual disputes are resolved in plaintiff's favor. *Blue Ball Properties,* 658 F.Supp. at 1315; *Greenly v. Davis,* Del.Supr., 486 A.2d 669 (1984); *Harmon v. Eudaily,* Del.Super., 407 A.2d 232 (1979), *aff'd,* Del. Supr., 420 A.2d 1175 (1980).

Following a *prima facie* showing that the nonresident defendant falls within the parameters of the Delaware long-arm statute, the analysis is not complete. Instead, the Court must also determine whether the exercise of personal jurisdiction in this matter would offend due process. *International Shoe Co. v. Washington,* 326 U.S. 310, 319, 66 S.Ct. 154, 159, 90 L.Ed. 95 (1945); *See also Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 471–72, 105 S.Ct. 2174, 2181–82, 85 L.Ed.2d 528 (1985). The "constitutional touchstone" in a specific jurisdiction case such as the instant one is whether the defendants purposely established minimum contacts with the forum state. *Burger King,* 471 U.S. at 474, 105 S.Ct. at 2183.[4]

Minimum contacts may be established when "the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980) (Brennan, J. dissenting). Once it has been established that the defendant has

---

**4.** Specific jurisdiction exists when a nonresident defendant has "purposely directed" his activities at residents of the forum state and the litigation results from the alleged injuries that arise out of or relate to those activities. *Heliocopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984). In the case at bar, Plaintiff has alleged that all of the Defendants who are challenging the jurisdiction of this Court have engaged in activities in Delaware that are at the heart of this lawsuit.

minimum contacts with the forum state, the Court must then determine whether the exercise of personal jurisdiction would comport with traditional notions of "fair play and substantial justice." *Burger King*, 471 U.S. at 476, 105 S.Ct. at 2184. Considerations important to this analysis include the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in effectively resolving controversies and advancing substantive social policies. *Id.* at 477, 105 S.Ct. at 2184 (quoting *World–Wide Volkswagen*, 444 U.S. at 292, 100 S.Ct. at 564).

### 1. *John Nucci*

■ Plaintiff has asserted that *in personam* jurisdiction exists over Defendant Nucci under each of the six enumerated subsections of section (c) of the Delaware long-arm statute. It is unnecessary to address each of the Plaintiff's contentions individually as the Court is satisfied that Nucci "has an interest in, uses or possesses real property in the State" of Delaware and thus meets the requirements of section 3104(c)(5).

As a preliminary matter, it is uncontroverted that Nucci is the holder of a mortgage in the amount of $140,000 on the Marina property.[5] This alone is sufficient to establish that Defendant has an interest in property located in the State of Delaware. In addition, Defendant Nucci has numerous contacts with the State of Delaware. For example, he is a limited partner and an alternate general partner in TMLP, the limited partnership that owns or controls 49% of the Marina Property. Nucci is also the sole stockholder, officer and director of W.N., a corporation that owns or controls 1% of the Marina property. Moreover, W.N., is both a limited and general partner in Flight's End Limited Partnership, an entity that owns or controls 50% of the Marina Property. It is also significant that when the Marina Property was encumbered by a 2.33 million dollar mortgage, W.N. acted as the general partner for Flight's End and John Nucci, acting in his capacity as President of W.N., personally signed the document. As is evident by the foregoing, Nucci has consistently and substantially directed his activities toward the State of Delaware either personally or through entities controlled by him.

■ Based on the foregoing, it appears that Plaintiff has established a *prima facie* case that Nucci falls within Delaware's long-arm statute and that continuous and substantial "minimum contacts" exist. The Court now turns to factors identified by the Supreme Court in *World–Wide Volkswagen*. First, it is clear that the burden of litigating this case is not unduly excessive in that most of the Defendants and witnesses are located in the nearby state of Maryland. Second, Delaware as the forum state has an interest in the litigation in that the Marina Property and the Topside Restaurant are located in Delaware. In addition, Delaware and the Plaintiff have an interest in insuring that a Delaware court's decision in rendering judgment against Topside could be enforced.

The interstate judicial system's interest in obtaining the most efficient resolution of the controversy would also be served by this Court exercising jurisdiction over Nucci. For example, several Maryland Defendants such as Exten, TMLP, Topside and GAC are unquestionably subject to this Court's jurisdiction as they have consistently transacted business in this State. Allowing this action to proceed against all Defendants and thereby resolve all claims against them rather than pursue a course

---

5. The mortgage arose in 1981 when Exten approached Nucci regarding a tax liability that Topside accrued with regard to federal withholding taxes. Exten allegedly stated that he was unable to raise the money and that the Topside Restaurant would be closed down if he could not meet that obligation. Docket Item ("D.I.") 75 at 56. According to Nucci, he advanced Exten $140,000 to protect his already significant investment in TMLP. In January of 1982, as security for the advance, TMLP executed a $140,000 mortgage on the Marina Property in favor of Defendant John Nucci and his wife Sally Nucci. The mortgage was subordinated to two pre-existing mortgages and was executed by Exten in his capacity as general partner of TMLP.

of multi-state piece-meal litigation would certainly result in the most efficient interstate resolution of the controversy. In spite of the shared interest of the several states in furthering fundamental social policies being inconclusive at best, this Court finds that the exercise of jurisdiction over John Nucci in this instance would not offend traditional notions of fair play and substantial justice. *International Shoe,* 326 U.S. at 316, 66 S.Ct. at 158.

### 2. *Sally Jane Nucci*

█ Plaintiff has asserted numerous grounds for asserting personal jurisdiction over Sally Nucci but the only concrete one is that she is a co-mortgagee of the Marina Property in the amount of $140,000. As discussed previously, Defendant Sally Nucci's mortgage interest on the Marina Property is sufficient to demonstrate that she "has an interest in, uses or possesses real property in the State" of Delaware and thus meets the requirements of section 3104(c)(5).

█ Similarly, the fact that she has a mortgage interest in Delaware real estate is sufficient to establish that she has "minimum contacts" with the State of Delaware. Although Defendant Sally Nucci's contacts with the State of Delaware are substantially less than her husband's, all that is constitutionally required is that she, through the commission of some affirmative act, "purposefully avails [herself] of the privilege of conducting activities within the forum state, thus invoking the benefit and protection of its laws." *Burger King,* 471 U.S. at 475, 105 S.Ct. at 2183. In the instant case, Defendant Sally Nucci has affirmatively taken an interest in Delaware real property and would presumably invoke the protection and benefit of its laws if the mortgage terms were not complied with. *See also Equitable Trust Co. v. O'Neill,* Del.Super., 420 A.2d 1196, 1199 (1980) (minimum contacts established by nonresident mortgagor's interest in Delaware real estate). As the consideration of the *World–Wide Volkswagen* factors would be the same as in the case of John Nucci, this Court finds that the exercise of personal jurisdiction is properly exercised over Sally Nucci.

### 3. *Gary A. Goldstein*

█ Plaintiff alleges that personal jurisdiction may be exercised over Defendant Goldstein based on section 3104(c)(1) (transaction in Delaware), (c)(3) (tortious act committed in Delaware by person in Delaware) or (c)(4) (tortious injury committed in Delaware by person outside of Delaware). The Court believes that the strongest basis for applying the Delaware long-arm statute is section 3104(c)(4) which encompasses non-resident defendants who cause "tortious injury in the State or outside the State by an act or omission outside the State if he regularly does business or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services or things used or consumed in the State."

Plaintiff submits the following facts as indicative of Defendant Goldstein's contacts with the State of Delaware. In 1976, Goldstein formed and was a limited partner of GAC Limited Partnership. GAC was created for the express purpose of acquiring and leasing Delaware real estate. D.I. 118A, Ex. 3. In 1977, Goldstein formed Topside Corporation for the express purpose of operating the Topside Restaurant in Delaware. Goldstein was a shareholder, officer and director in Topside Corporation. *Id.,* Ex. 2. In 1979, Goldstein appeared in Delaware at a Sheriff's Sale representing TMLP when it bought the parcels of Delaware property previously owned by Exten Associates. *Id.,* Ex. 14.

After the purchase, TMLP conveyed to GAC the real estate upon which the old Topside Restaurant was located while retaining the remaining fourteen acres for itself for future development. *Id.,* Ex. 4. Soon afterwards, Goldstein signed a real estate lease agreement between GAC and Topside Corporation. *Id.* The Acknowledgment to the lease reflects that the document was signed and notarized in Delaware although Goldstein asserts that the lease may have been mailed to a post office box in Delaware maintained by Exten. *Id.*

In 1982, Goldstein and his wife, along with the Extens, Nuccis, Topside Corporation, TMLP and GAC entered into a settlement agreement with the bankruptcy trustee in the Exten Associates bankruptcy case. D.I. 1, Ex. H. The settlement agreement discharged all litigation that had been brought by the trustee against the various parties. The litigation involved allegations of fraud in the transfer of assets from Exten Associates to various other entities also controlled by Exten. Goldstein was required by the trustee to execute a personal guarantee on a portion of the $500,000 that Topside and TMLP allegedly owed the Exten Associates, Inc. estate. *Id.* Goldstein also received an assignment of one-third of fire insurance proceeds for the old Topside Restaurant. D.I. 118A, Ex. 8.[6]

After the settlement conference or possibly even before, Goldstein was instrumental in TMLP obtaining a commercial loan from Old Court. For his services, Goldstein was to receive $20,000 in attorneys fees, of which he actually received $16,000. *Id.*, Ex. 19. The remaining $4,000 was endorsed by Goldstein over to Jeffrey Levitt, the then President of Old Court. *Id.* In addition, of the $75,000 set aside as a "construction draw" by the terms of the loan, Goldstein received a check from Old Court in the amount of $30,000 which he deposited into his personal account. *Id.*, Ex. 18.

On January 17, 1984, Goldstein formed Flights End Limited Partnership for the purpose of acquiring ownership and development of the Delaware property owned by TMLP. *Id.*, Ex. 21. This was only sixteen days after Plaintiff won a default judgment against Topside Corporation in Delaware Superior Court in the amount of $259,933.79. Goldstein incorporated both corporate general partners of Flights End, being W.N. for William Nucci and O.C. Flights, Inc. for Old Court. *Id.*, Ex. 22. Goldstein received $100,000 for the formation of Flights End and was the sole officer, director and shareholder of O.C. Flights at the time of its formation. *Id.*,

Ex. 26, 31. In February of 1984, Goldstein represented Flights End in obtaining a commercial loan with Old Court in the amount of $2,330,000. *Id.*, Ex. 29. The loan reduced Topside's interest in the fourteen acres, increased the debt load to almost double the appraised value for the entire fourteen acres, generated fees for Goldstein and payments to Levitt.

In 1986, Goldstein brought a foreclosure action on the Delaware property adjacent to the Topside Restaurant owned by GAC. *Id.*, Ex. 9. Evidently, when Exten Associates, Inc. conveyed the real property to GAC, it did so with an open mortgage to Maryland National Bank. When the loan went into default, Maryland National commenced litigation to recover the amount due. Because Exten was in the midst of a personal bankruptcy action, Maryland National proceeded against the three limited partners. At some point, the limited partners entered into a settlement with Maryland National and each other by which Maryland National received the fire insurance proceeds from the 1980 fire and the three limited partners were appointed "Trustees" for the loan. *Id.*

In 1987, Gary Goldstein, as one of the Trustees of the unrecorded assignment of Maryland National's mortgage, forced the sale of GAC's property which was promptly bought back by the three limited partners acting in their capacity as trustees. *Id.* In 1988, Goldstein, for himself and under the power of attorney for another trustee, signed a deed selling the GAC property for an estimated $125,000. *Id.*

Based on the foregoing, it is evident to the Court that Defendant Goldstein's intimate involvement in this affair transcends the mere rendering of professional services. The unadorned facts and Plaintiff's allegations constitute a sufficient showing that Goldstein engaged in a persistent course of conduct regarding the Delaware real estate in question. Moreover, Goldstein derived substantial revenues from the

---

**6.** The Court notes that in the settlement agreement originally contemplated, Goldstein and his wife would be personally liable to the bankrupt-cy estate for the sum of $150,000. This passage was struck in favor of a personal guarantee by the Goldsteins of that amount. D.I. 1, Ex. H.

services and business activities that he has conducted in his various roles as attorney, agent, principal, limited partner, trustee, shareholder, officer and director.

Accordingly, the Court concludes that the Plaintiff has established a *prima facie* case of jurisdiction under Delaware's long-arm statute and has demonstrated that Goldstein has "minimum contacts" with the State of Delaware. While it is true that Goldstein currently resides in the State of Florida, the Court's prior consideration of the remaining of the *World–Wide Volkswagen* factors supports an exercise of personal jurisdiction over this Defendant as well.

### B. Old Court and O.C. Flights

Plaintiff alleges in Counts XII, XIII and XIV of his complaint that Defendants Old Court Savings & Loan ("Old Court") and O.C. Flights, in conjunction with the other named Defendants in this action, were associated together in fact to form an enterprise for the common purpose of defrauding and conspiring to defraud Plaintiff's ability to collect his judgment debt. Plaintiff asserts that the above Defendants, in furtherance of the alleged scheme to defraud, engaged in a pattern of racketeering activity through the use of the United States mails and interstate wire facilities.

Racketeering activity as defined by section 1961(1) of RICO includes both state law crimes such as murder or extortion and a specified list of federal crimes such as mail fraud. 18 U.S.C. § 1961(1). In order to successfully plead a pattern of racketeering activity, a plaintiff must demonstrate that a defendant has committed at least two predicate acts of racketeering activity within a ten year period. 18 U.S.C. § 1961(5). In the instant case, Plaintiff alleges that Defendants Old Court and O.C. Flights committed predicate acts of mail and wire fraud, 18 U.S.C. §§ 1341 and 1343.

The elements of a mail fraud statute violation are a scheme to defraud, participation by the defendant in the scheme with specific intent to defraud and the use of the post office in furtherance of the scheme. *U.S. v. Burks*, 867 F.2d 795, 797 (3rd Cir.1989). Similarly, a violation of the wire fraud statute requires a scheme to defraud, defendant's participation with specific intent and an interstate wire transmission in furtherance of the scheme. *In re Phillips Petroleum Securities Litigation*, 881 F.2d 1236, 1249 (3rd Cir.1989). In pleading the fraud element of a wire or mail fraud violation, it is only necessary "to plead with particularity the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Seville Indus. Machinery v. Southmost Machinery*, 742 F.2d 786, 790–91 (3rd Cir.1984), *cert. denied*, 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985).

In the case at bar, Plaintiff asserts that Defendant Old Court participated in a scheme to fraudulently dissipate the assets of Defendant Topside and thus hinder or preclude the Plaintiff from collecting the outstanding judgment against Topside. Plaintiff further contends that as the mails and wires were used to further the alleged scheme, Defendants Old Court and O.C. Flights committed the requisite predicate acts of mail and wire fraud constituting a violation of sections 1962(a), (c) and (d) and thus subjecting them to the civil remedy provisions of section 1964(c).[7]

---

**7.** The pertinent provisions of RICO proscribe the following activities, 18 U.S.C. § 1962:

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce....

\* \* \* \* \* \*

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in ... interstate or foreign commerce, to conduct or participate ... in the conduct of such enterprise's affairs through a pattern of racketeering activity....

Defendants Old Court and O.C. Flight's participation in the above scheme is premised on a relationship between Defendant Gary Goldstein, who acted as Old Court's general counsel in the 1983 and 1984 loan transactions, and Old Court's former president, Jeffrey Levitt. Plaintiff contends that Levitt approved loans brought to him by Goldstein in return for kickbacks and other monetary consideration. Plaintiff asserts that this relationship allowed Defendants Exten, Goldstein and Nucci to engage in a course of conduct where they would set up shell entities for the purpose of holding Delaware real estate. The above Defendants would then manipulate these shell entities for the purpose of securing construction loans. Once the construction loans were consummated, Defendants would dissipate the proceeds, strip the shell entities of their assets and then allow the loans to go into default. Plaintiff concludes that Defendants Old Court and O.C. Flights should be held vicariously liable for the actions and knowledge of Levitt and Goldstein in facilitating the above scheme.

In response, Defendants Old Court and O.C. Flights argue that they should not be held vicariously liable for the actions of Goldstein and Levitt because they were also victims of the alleged fraudulent scheme. Defendants' argument is premised on a legal principle first expressed by the Seventh Circuit when it stated that "it would make little sense to hold a corporation liable under RICO for the misconduct of lower level employees, at least where it appears that the corporation is a passive instrument or even a victim of the racketeering activity." *Haroco v. American Nat. B. & T. Co. of Chicago*, 747 F.2d 384, 401 (7th Cir.1984), *aff'd per curiam*, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). This principle has since been re-

affirmed many times. *See, e.g., D & S Auto Parts, Inc. v. Schwartz*, 838 F.2d 964, 967 (7th Cir.) ("*Respondeat superior's* premise is liability without fault, a concept inconsistent with the language of § 1962(c) as interpreted by this court. Imposing vicarious liability would defeat the purpose of RICO, 'which after all is to reach those who ultimately profit from racketeering, not those who are victimized by it.'") (quoting *Haroco*, 747 F.2d at 402), *cert. denied*, 486 U.S. 1061, 108 S.Ct. 2833, 100 L.Ed.2d 933 (1988); *Luthi v. Tonka Corp.*, 815 F.2d 1229, 1230 (8th Cir.1987) (refusing to impose *respondeat superior* liability on corporation based on fraudulent acts committed by its chief financial officer); *Petro-Tech, Inc. v. Western Co. of North America*, 824 F.2d 1349, 1358 (3rd Cir.1987) (declining to apply vicarious liability in section 1962(c) case); *Schofield v. First Commodity Corp. of Boston*, 793 F.2d 28, 31–33 (1st Cir.1986) (same).[8]

Moreover, as one court has recently stated:

> The notion that a corporation should be vicariously responsible under RICO for the independent fraudulent acts of one of its employees is a rather startling one. By its plain terms, RICO only imposes liability on corporations that benefit from the racketeering activity. Indeed the initial intent of the statute was to *protect* corporations from criminal infiltration, not to make them the responsible parties.

*Banque Worms v. Luis A. Duque Pena E Hijos, Ltda.*, 652 F.Supp. 770, 772 (S.D.N.Y.1986). *See also Kahn v. Chase Manhattan Bank, N.A.*, 760 F.Supp. 369, 373 (S.D.N.Y.1991) ("This court agrees with the analyses of the First, Seventh, and Eighth Circuits, as well as other courts in this district, and finds that the independent acts of an employee not acting in his em-

---

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b) or (c) of this section.

**8.** The Court recognizes that a number of the above cases opposing the imposition of vicarious liability may be distinguished on the ground that the Court was attempting to enforce section 1962(c)'s statutory requirement that the "person" who violates RICO be separate from

the "enterprise" through which the violation is committed. *See, e.g., Schofield*, 793 F.2d at 31. *See also, B.F. Hirsch v. Enright Refining Co., Inc.*, 751 F.2d 628, 634 (3rd Cir.1984). The Court believes, however, that the policy rationale that RICO was designed to punish victimizers rather than victims expressed in those cases is directly applicable to the instant case.

ployer's interest are not a sufficient basis to hold the employer liable under RICO.")

In the present case, it is quite clear that Defendants Old Court and O.C. Flights were the victims of the alleged fraudulent scheme rather than the victimizers. First, it is uncontested that Levitt was not acting in his employer's interest when he defrauded Old Court of millions of dollars between 1982 and 1985. As a result, Old Court was forced into receivership and Levitt is currently serving a thirty year jail sentence. Second, Plaintiff has offered no evidence that either Levitt or Goldstein had any authority, either actual, implied or apparent, by Old Court's board of directors to engage in any of the fraudulent conduct alleged in Plaintiff's complaint. *See Bernstein v. IDT Corp.*, 582 F.Supp. 1079, 1083 (D.Del.1984) ("When conduct is proscribed by a federal statute and civil liability for that conduct is explicitly or implicitly imposed, the normal rules of agency law apply in the absence of some indication that Congress had a contrary intent."). Third, based on Plaintiff's RICO case statement, the alleged pattern of racketeering consisted of securing construction loans, dissipating the proceeds and then allowing the loans to go into default. Since this is exactly what occurred to Old Court, the Court is hard-pressed to understand how Old Court was a participant and not a victim of the alleged scheme.

Finally, and most importantly, Plaintiff has failed to set forth a plausible economic theory under which Old Court and O.C. Flights could have reasonably "benefitted" from the alleged fraudulent actions of Levitt and Goldstein. For example, in *Northern Trust Bank/O'Hare, N.A. v. Inryco, Inc.*, 615 F.Supp. 828 (N.D.Ill.1985), the plaintiff argued that a contractor should be held vicariously liable for harm arising out of a fraudulent scheme involving an employee of the contractor and a subcontractor. The basis of the purported fraudulent scheme was that in return for kickbacks, the employee would look the other way while the subcontractor performed substandard work. In considering and rejecting the plaintiff's allegations, the District Court noted that "[w]e need not subscribe

to the proposition that all men universally act as rational economic beings to recognize the unlikelihood of such self-inflicted wounds, which would both impoverish a general contractor and expose it to large claims by the property owner." *Inryco*, 615 F.Supp. at 834 n. 7.

Like the *Inryco* court, this Court is unpersuaded by Plaintiff's economic theory. Essentially, Plaintiff proposes a fraudulent scheme whereby Old Court lent excessive funds on insufficient collateral for the express purpose of facilitating the default of the loans. Such "self-inflicted" wounds make no more sense in this context than they did in *Inryco*. Moreover, as Justice Powell observed in *Matsushita Elec. Industrial Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), "if the factual context renders respondents' claim implausible—if the claim is one that simply makes no economic sense—respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary." In the present case, Plaintiff has failed to meet this burden. Accordingly, Old Court's and O.C. Flight's motion for summary judgment on Counts XII, XIII and XIV is hereby granted.

**C. John and Sally Nucci**

Defendants John Nucci, Sally Nucci, Flight's End Limited Partnership and W.N., Inc. have filed a combined motion for summary judgment on the grounds that Plaintiff has failed to allege sufficient non-RICO claims to withstand Defendants' motion for summary judgment, Plaintiff lacks standing to bring a RICO or fraud suit based on injuries to Topside rather than himself, Plaintiff has failed to allege a proper RICO enterprise and that no cause of action is stated against Sally Nucci who is solely a mortgagee of the Marina Property. The Court will address each of these contentions in turn.

**1. *Non–RICO Claims***

Defendants' first ground for granting summary judgment may be easily disposed of. Delaware's Fraudulent Convey-

ance Act provides that a conveyance "includes every payment of money, assignment, release, transfer, lease, mortgage or pledge of tangible or intangible property, and also the creation of any lien or incumbrance." 6 Del.C. § 1301. When the conveyance is made "without fair consideration ... [and] the person making the conveyance ... intends or believes that he will incur debts beyond his ability to pay as they mature, [the conveyance] is fraudulent as to both present and future creditors." 6 Del.C. § 1307. In addition, "every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." 6 Del.C. § 1308. As Plaintiff has adequately alleged that the assorted conveyances constituting Defendant's purported scheme to defraud were conducted with either intent to defraud or for inadequate consideration, such transfers fall within the plain language of the fraudulent conveyance act.

## 2. *Standing*

■■■ Defendants' second ground for granting summary judgment has been presented in the form of two arguments. First, Defendants argue that a creditor has no standing to state a RICO cause of action based upon the actions of his debtor. D.I. 106 at 12. Defendants' second argument is that Plaintiff has no standing to any action taken in reference to the Marina Property when the Plaintiff is only a creditor of the general partner to the owner of the property. *Id.* at 13. As each contention relates to the legal premise that when a corporation's assets are fraudulently depleted, the injury is direct to the corporation and only indirect as to a creditor, both standing arguments will be considered together.

The RICO statute provides that "any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor ... and shall recover threefold the damages he sustains...." 18 U.S.C. § 1964(c). The Third Circuit has interpreted this provision to require that in order to adequately state

RICO standing, a plaintiff must demonstrate that his injury is one that "necessarily stems from 'predicate acts' that underpin the section 1962 violation." *Shearin v. E.F. Hutton Group, Inc.,* 885 F.2d 1162, 1167 (3rd Cir.1989) (citing *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 497, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985)). Predicate acts are meant to include those racketeering activities set forth in the catalogue of crimes found in section 1961(1). *Shearin,* 885 F.2d at 1167.

In cases involving depletion of corporate assets, it is well-settled that a "plaintiff may not seek [ ] RICO standing simply as a shareholder of an injured corporation." *Klapper v. Commonwealth Realty Trust,* 657 F.Supp. 948, 953 (D.Del.1987) (citations omitted). *See also Leach v. Federal Deposit Ins. Co.,* 860 F.2d 1266, 1273 (5th Cir.1988) (only right shareholders had against corporate directors for mismanagement was derivative, plaintiffs lacked standing for RICO claims), *cert. denied,* 491 U.S. 905, 109 S.Ct. 3186, 105 L.Ed.2d 695 (1989). Similarly, it has been held that in a RICO action brought against union members who allegedly mismanaged union funds, only the union had proper standing because the injury was to the union directly and the union members indirectly. *Adams–Lundy v. Ass'n of Pro. Flight Attendants,* 844 F.2d 245 (5th Cir.1988). *See also Carter v. Berger,* 777 F.2d 1173, 1176 (7th Cir.1985) (in RICO case, "an indirectly injured party should look to the recovery of the directly injured party, not to the wrongdoer, for relief").

Several courts have addressed the analogous issue of whether a judgment creditor may institute an action against individuals involved in the depletion of corporate assets. Each has held that this alone is insufficient to confer standing as the direct injury is to the victim corporation and only indirect as to the judgment creditor. *See In re Sunrise Securities Litigation,* 916 F.2d 874, 887–88 (3rd Cir.1990); *National Enterprises, v. Mellon Financial Services,* 847 F.2d 251, 254 (5th Cir.1988); *Brandenburg v. Seidel,* 859 F.2d 1179, 1189 (4th

Cir.1988); *Wooten v. Loshbough,* 738 F.Supp. 314, 315–16 (N.D.Ind.1990).

On the other hand, if the injury to the creditor is distinct from that of the corporation, then courts have held that the judgment creditor has standing to bring a RICO action. For example, in *Ocean Energy II v. Alexander & Alexander, Inc.,* 868 F.2d 740 (5th Cir.1989), plaintiffs brought a RICO suit against an insurance agent alleging fraud in sale of an insurance program. Plaintiffs alleged that they were directly injured when the insurance company later became insolvent as they never would have purchased the program otherwise. The Fifth Circuit found that the plaintiffs were the victim and target of an alleged scheme to induce the plaintiffs to purchase the insurance program. As such, the injury to the plaintiffs was direct and distinct from those accruing to other creditors who suffered injury as a result of the insolvency of the insurance company. *Id.* at 746–47.

Similarly, in *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096 (2nd Cir.1988), plaintiff brought a RICO action against several defendants who fraudulently conveyed and concealed assets during the course of a bankruptcy proceeding. It was alleged that defendants executed a fraudulent scheme by which they transferred assets outside of a bankrupt corporation and then misrepresented to the plaintiff during a reorganization plan confirmation proceeding that the proposed plan contained all of the bankrupt's assets. Relying on defendant's representations as to the worth of the bankrupt, plaintiff consented to the reorganization plan and agreed to receive only 17.5% of its allowed claim. *Id.* at 1098–99. The *Bankers Trust* court held that because the plaintiff had been directly injured as a result of defendant's predicate acts of racketeering activity, the plaintiff had standing, "regardless of the fact that a bankrupt BAC might also have suffered an identical injury for which it has a similar right of recovery." *Id.* at 1101.

Based on the foregoing precedent, the Court finds that the case at bar differs from a typical judgment-creditor standing case in two important respects. First, there is no evidence that Plaintiff is one of a general class of creditors who have been injured as a result of the "looting" of Topside Corporation's assets. Thus, there is no danger of a multiplicity of lawsuits brought by similarly situated general unsecured creditors. *See, e.g., In re Sunrise Securities Litigation,* 916 F.2d at 888 (allowing indirectly injured depositors to bring individual RICO suits could lead to a multiplicity of suits and "disrupt the efforts of the FDIC to recover the institution's assets"). Second, Plaintiff alleges that the dissipation of corporate assets was directed specifically at hindering his ability to collect his debt. This allegation alone indicates that Plaintiff's injury is separate and distinct from any other party or that of the corporation. *See In re Sunrise Securities Litigation,* 916 F.2d at 887 (individual depositors could not bring RICO action where the injury to depositors as a result of bank failure was sustained by all depositors and was incidental and dependent upon injury to the institution). Accordingly, the Court holds that the Plaintiff has standing to bring his RICO claims against the Defendant.

#### 3. *RICO Enterprise*

██ Defendants' third ground for summary judgment is that Plaintiff has failed to state a proper RICO enterprise in that the "person" committing the RICO violation cannot be the "enterprise" through which that violation occurs. As a preliminary matter, it is well-settled that an enterprise need not be distinct from an individual defendant for the purposes of section 1962(a). *Shearin,* 885 F.2d at 1165 (citing *Petro–Tech,* 824 F.2d at 1360). Turning to the section 1962(c) allegations, the Court notes that the "person" to be held liable under the RICO statute "must be employed by or associated with" an "enterprise." Thus, a defendant cannot be both a "person" and an "enterprise" in a section 1962(c) action. *See Saporito v. Combustion Eng. Inc.,* 843 F.2d 666, 678 (3rd Cir. 1988); *Hirsch,* 751 F.2d at 633–34.

The Court notes, however, that the definition of enterprise in section 1961(4) in-

cludes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). In addition, the interpretation of the enterprise term in the Third Circuit "has been liberal, and nothing precludes an association of corporations for illicit purposes from constituting an enterprise." *Shearin*, 885 F.2d at 1165–66. In paragraph 70 of the complaint, the Plaintiff pleads the existence of an enterprise "associated together in fact" of the various Defendants named in the complaint. D.I. 1 at 31. In paragraph 17, the Plaintiff alleges interrelationships by and between the Defendants apart and separate from the conduct which makes up the pattern of RICO activity, the allegations of the Defendant's participation in the enterprise merely go toward their continuing association with it. *See Shearin*, 885 F.2d at 1166. Accordingly, the Court finds that the Plaintiff has adequately alleged a RICO enterprise and Defendant's third ground for summary judgment is denied.[9]

4. *Substantial Involvement*

 Defendants' fourth and final argument is that Sally Nucci's participation as mortgagee of TMLP is too attenuated as a matter of law to allow Plaintiff to join her as a defendant. D.I. 106 at 21. This argument is premised on the legal principle that a peripheral player in a RICO enterprise may only be held liable for participation in the enterprise if that participation is substantial. *See Town of Kearney v. Hudson Meadows Urban Renewal*, 829 F.2d 1263, 1269 (3rd Cir.1987) ("Participation in the enterprise, if substantial ... is enough to establish liability ... regardless of whether the timing of such substantial participation postdates the commencement of the enterprise.") (citation omitted).

In the instant case, Plaintiff alleges that Sally Nucci's participation in the alleged scheme to defraud is based both on her co-mortgage interest on the Marina Property

and John Nucci's signing the 1984 settlement agreement as her agent. D.I. 107 at 22–23. Because Plaintiff's allegations raise disputed issue of material fact concerning both the scope and duration of the purported agency relationship between John and Sally Nucci, the Court denies Defendants' motion for summary judgment on this issue.

### III. CONCLUSION

Defendants Gary Goldstein and John and Sally Nucci's motions to dismiss on the ground that this Court lacks personal jurisdiction over them is denied. Old Court and O.C. Flight's motion for summary judgment is granted. Defendants John and Sally Nucci, Flight's End and W.N., Inc.'s motion for summary judgment is denied in its entirety.

---

**9.** Because section 1962(d) merely states that it shall be unlawful for any person to conspire to violate any of the subsections of section 1962 and Plaintiff has adequately alleged a RICO

enterprise in relation to those provisions, it is unnecessary to address the enterprise requirement for the conspiracy count.