**OUTOKUMPU ENGINEERING
ENTERPRISES, INC.,**
Plaintiff,

v.

**KVAERNER ENVIROPOWER, INC.,
Kvaerner, Inc. and Kvaerner En-
viroPower, AB, Defendants.**

No. 95C–12–080–JOH.

Superior Court of Delaware,
New Castle County.

Submitted: March 19, 1996.
Decided: July 10, 1996.

Thomas R. Hunt, Jr., and Kurt M. Heyman, of Morris, Nichols, Arsht & Tunnell, Wilmington, and Leland G. Cook (argued), of Smith, Gambrell & Russell, Atlanta, GA, for plaintiff.

M. Duncan Grant (argued), and Daniel V. Folt, of Pepper, Hamilton & Scheetz, Wilmington, for defendants.

## OPINION

HERLIHY, Judge.

Defendant Kvaerner EnviroPower, AB [KAB] has moved this Court to dismiss for lack of personal jurisdiction. Plaintiff Outokumpu Engineering Enterprises, Inc. [Outokumpu], brought this action for breach of contract against all three defendants.

### FACTS

It is important to identify the players as part of the factual background of this case. Plaintiff Outokumpu is a Delaware corporation with its principal place of business in Atlanta, Georgia. It is a wholly owned subsidiary of Outokumpu Technology Oy, a Finnish corporation located in Espoo, Finland.

Defendant Kvaerner EnviroPower, Inc. [KEPI] is a Delaware corporation. At the time of the transactions at issue here, its principal place of business was in Owings Mills, Maryland. Defendant Kvaerner, Inc. [KI] is a Delaware corporation with its principal place of business in Stamford, Connecticut. Defendant KAB is a Swedish corporation with its principal place of business in

Göteborg, Sweden. The stock of KAB is wholly owned by Kvaerner a.s. [KAS], a Norwegian corporation with its principal place of business in Oslo, Norway. KAS is not a party to this action.

On February 28, 1994, KI purchased all the stock of Outokumpu EcoEnergy, Inc., [EcoEnergy], a Delaware corporation, from plaintiff Outokumpu. EcoEnergy was subsequently renamed Kvaerner EnviroPower, Inc. (KEPI). All of KI's stock is owned by KAS. Various of these parties executed a stock purchase agreement, along with an agreement to complete construction of a power station in Whitecourt, Alberta, Canada. In addition, a technology agreement was signed.

The Finnish corporation signed the stock purchase agreement as a guarantor. It also signed a performance and payment agreement which included clauses stating that that agreement would be governed by and construed in accordance with Norwegian law. Oslo was designated as the proper "venue" for any dispute under that agreement.

The negotiations involving all these agreements occurred in Connecticut, Georgia, Maryland, New Jersey, New York, Washington, D.C., Canada, Finland and Sweden. There were no negotiations in Delaware.

KEPI was the general contractor on the Whitecourt power plant construction project. Outokumpu's complaint implies that KI also undertook certain duties to help complete the Whitecourt plant. KAB signed a "Performance and Payment Guarantee" [Guarantee Agreement] guaranteeing it would pay, indemnify and perform all KEPI and KI obligations in connection with the technology agreement, the stock purchase agreement and the agreement to complete the Whitecourt power plant.

Paragraph 3 of the Guarantee Agreement states:

This guarantee and the obligations of the undersigned shall be governed by and construed in accordance with the laws of the Kingdom of Sweden. The undersigned hereby agrees:

a. to subject itself to the jurisdiction of the Swedish Courts;

b. to accept as validly and properly served any documents, notice or other process sent to it at its address Anders Carlssons gata 14, S–40273, Göteborg, Sweden; and

c. that Göteborg shall be the proper venue for any dispute concerning any claim or dispute relating to this Guarantee.

Appended to Outokumpu's response to KAB's motion to dismiss are several affidavits. One is from a Warwick Johnston [Johnston] who participated, through a consulting firm hired by Outokumpu, in the negotiations for the sale of EcoEnergy's stock. KAB and KAS were on the other end of the negotiations. Johnston says KAB's president was the principal decision-maker on that end of the negotiations.

KAS sent a proposal to the Finnish corporation regarding the stock sale. It proposed that KI buy EcoEnergy's stock. KAS describes KI as "the holding company for all Kvaerner activities in the United States." KAS proposal of November 15, 1993. KAS also states KAB was to be "operational[ly] responsib[le] for [KEPI]". *Id.*

Because of the structure of the deal and who the real parties were, Johnston says KAB signed the guarantee for KI and KEPI. He also says the Finnish corporation provided certain guarantees for Outokumpu.

Another affidavit supplied by Outokumpu is from David S. Thomas [Thomas]. He says he had certain operational responsibilities for Outokumpu at the Canadian power plant. Thomas relates that he participated in a telephone conference call with KAB's president who promised to put a KAB project manager on the site. Such a person did appear. In 1995, KAB's president, Thomas and others attended a meeting in Atlanta, Georgia, to discuss the need to complete the project.

Additional KAB employees appeared at the Whitecourt construction site after the Atlanta meeting. Thomas states, "my understanding was that [KAB's president] maintained an active involvement in [Whitecourt], in an attempt to insure KEPI performed its contractual obligations." Thomas affidavit at 3. Thomas also says site reports indicate KAB's chairman visited the Canadian site.

Kalevi M. Turkia [Turkia], another affiant for Outokumpu, states he attended a meeting in Toronto, Canada, in September 1994, which KAB's president also attended. Whitecourt's owner threatened to fire KEPI as construction manager, but, according to Turkia, KAB convinced the owner to keep KEPI.

KAB's current president, not the one identified above, says that EcoEnergy's assets after the stock deal was closed were contracts to construct two power plants. One was in Whitecourt and the other was in Nova Scotia.

Outokumpu is suing the defendants for alleged breaches of contract arising out of the construction project in Canada.

### PARTIES' CLAIMS

KAB moves to dismiss on the basis that it never expected to be haled into a Delaware court because its actions in Delaware were limited to guaranteeing certain obligations of KEPI and KI and because the guarantee would be governed by Swedish law and that KAB agreed to be sued in Sweden. Outokumpu counters that the contract language is permissive, rather than mandatory, and that KAB's actions are sufficient to justify personal jurisdiction. Outokumpu also argues that KAB should be liable in Delaware for the actions of KI under either an alter ego or agency theory.

### APPLICABLE STANDARD

■ When personal jurisdiction is challenged by a motion to dismiss, the plaintiff has the burden to show a basis for the Court's jurisdiction over the nonresident defendant. *Plummer & Co. Realtors v. Crisafi*, Del.Super., 533 A.2d 1242, 1244 (1987). The plaintiff satisfies this burden by making a *prima facie* showing that jurisdiction is conferred by statute. *Mid–Atlantic Machine & Fabric, Inc. v. Chesapeake Shipbuilding, Inc.*, Del.Super., 492 A.2d 250, 253 (1985). All factual inferences must be viewed in a light most favorable to the plaintiff. *Greenly v. Davis*, Del.Supr., 486 A.2d 669, 670 (1984).

The issues involved here have been submitted on the pleadings, several affidavits and a copy of the Guarantee Agreement.

Neither party has requested an evidentiary hearing and the Court has determined, in its discretion, that one is not necessary. *Sears, Roebuck & Co. v. Sears, plc*, D.Del., 744 F.Supp. 1297, 1301 (1990). The facts do not appear to be in dispute.

### DISCUSSION

Outokumpu relies upon two parts of Delaware's long-arm statute to support its claim that this Court has jurisdiction over KAB. Specifically it relies upon 10 *Del.C.* §§ 3104(c)(1) and (2):

As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or his personal representative, who in person or through an agent:

(1) Transacts any business or performs any character of work or service in the State;

(2) Contracts to supply services or things in this State;

■ This Court must follow a two-part test in determining whether it has personal jurisdiction over defendant KAB. First, the Court determines whether the actions of KAB fall under either the general jurisdiction or specific jurisdiction provisions of Delaware's long-arm statute. Second, the Court determines whether exercising jurisdiction over KAB is constitutionally permissible. *See LaNuova D & B, S.p.A. v. Bowe Co.*, Del.Supr., 513 A.2d 764, 768–69 (1986).

### A

### Delaware Long–Arm Statute

The general jurisdiction issue can be considered first. The portion of Delaware's long-arm statute dealing with general jurisdiction, 10 *Del.C.* § 3104(c)(4), permits a Delaware court to exercise personal jurisdiction over one who "[c]auses tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State."

The facts clearly show that KAB's activities do not fall within this section.

## Actions of the Parent

### Creation of the Subsidiary

██ The inquiry necessarily turns to the two above-cited specific subsections of § 3104. Although Delaware's long-arm statute is to be construed to the maximum extent consistent with due process, *see Jeffreys v. Exten*, D.Del., 784 F.Supp. 146, 151 (1992), and a single act may create the minimum contacts necessary to support personal jurisdiction, *id.*, the statute nevertheless requires that some act be performed "in the State" in order to support specific jurisdiction.[1] *See* 10 *Del.C.* §§ 3104(c)(1)–(2). In order to rely on KAS's incorporation of its subsidiary KI within Delaware as evidence of an act performed within the state, Outokumpu would have to show that its cause of action was related to *KAB's* corporate structure or in some way based on Delaware corporate law. *See Red Sail Easter Ltd. Partners, L.P. v. Radio City Music Hall Prods.*, Del.Ch., C.A. No. 12036, Allen, C., 1991 WL 129174 (July 10, 1991) (distinguishing command to interpret long-arm statute liberally from ignoring or slighting statutory language "in the State" in 10 *Del.C.* §§ 3104(c)(1)–(3)).

The Delaware Court of Chancery has decided that a breach of contract claim "in no sense relates" to organizing subsidiary corporation in Delaware. *See Red Sail, supra,* at 4. *See also Chaplake Holdings Ltd. v. Chrysler Corp.*, Del.Super., C.A. No. 94C–04–164, Babiarz, J., 1995 WL 653510 (August 11, 1995) at 9 ("The instant [breach of contract] litigation does not arise out of, or otherwise have any connection with, any alleged activities of [alien parent of a Delaware subsidiary] within the State of Delaware.").

There are two relevant Delaware Supreme Court opinions which involved parent-subsidiary relations. In *Papendick v. Bosch*, Del. Supr., 410 A.2d 148, 152 (1979), *cert. denied,* 446 U.S. 909, 100 S.Ct. 1837, 64 L.Ed.2d 262 (1980), a German parent corporation had formed a subsidiary Delaware corporation to act an investment vehicle for the purpose of acquiring shares of stock of another corporation. Delaware had jurisdiction over an individual plaintiff's suit against the parent for breach of a finder's fee agreement because the act of incorporating the Delaware subsidiary was itself a step in the series of actions that gave rise to the claim sought to be litigated. *Id.* (finding Delaware corporation "an integral part of the total transaction"). Thus, in *Papendick,* the act of forming the subsidiary was itself part of the breach, a claim not made here.

The case of *Sternberg v. O'Neil,* Del.Supr., 550 A.2d 1105, 1107 (1988) found a strong Delaware connection to a double derivative suit, because the suit depended on Delaware corporate governance law for its very existence and because no alternative forum existed. As a matter of Delaware law, the parent was an indispensable party. *Id.* at 1124. Certain language in *Sternberg,* if read very broadly, supports Outokumpu's argument. *Id.* at 1121 ("[A] foreign corporation cannot use the laws of this State to govern the operations of its subsidiary and then, in a suit relating to the operation of the subsidiary, claim that jurisdiction in Delaware offends traditional notions of fair play."). However, this language cannot mean that Delaware courts may always exercise personal jurisdiction over the foreign parent of a Delaware subsidiary or *any* cause of action arising out of the operation or acts of that subsidiary, regardless of where the operative facts transpired or the parent's contacts with Delaware. Otherwise, mere ownership of a Delaware subsidiary would in practice subject a foreign parent to our jurisdiction, a result inconsistent with due process. *See Sears,* 744 F.Supp. at 1306; *Chaplake, supra,* at 5. In any event, the breach of contract claims here do not implicate the governance of any corporation.

### Reincorporation

*Papendick's* proposed distinction between purchasing an existing Delaware subsidiary

---

**1.** Ownership of a Delaware subsidiary does not support general jurisdiction. *See Sears, Roebuck & Co. v. Sears plc,* D.Del., 744 F.Supp. 1297, 1306 (1990) ("Owning one subsidiary, where that subsidiary is not the alter-ego or general agent of the parent corporation, is not sufficient to establish substantial activities in the forum.").

and creating a wholly-owned Delaware subsidiary, *Papendick,* 410 A.2d at 152, was later rejected in *Sternberg,* 550 A.2d at 1121 (*dicta*). The *Sternberg* court found it significant that, over a period of thirty years, the parent foreign corporation had not reincorporated a purchased subsidiary under the laws of another state. *Id.* at 1121–1122. However, the *Sternberg* holding was based on the parent's express consent to jurisdiction manifested by registration within the State. *Sternberg* explicitly reserved the question of "the validity of serving, pursuant to 8 *Del.C.* § 382, a nonregistered foreign corporation, which is the owner of a Delaware subsidiary." *Id.* at 1122, n. 36.

An examination of the record presented in a light most favorable to Outokumpu shows the link between KAB and KI and/or KEPI to be jurisdictionally very tenuous. *KAS* caused KI to be incorporated in Delaware. KI bought EcoEnergy's stock which became KEPI. According to Outokumpu, KAB personnel may have been among the primary players in the negotiations leading up to all of the agreements, among which were ones signed by KAS.

Despite this involvement, KAB's connection to Delaware is much less and more indirect than the parent in *Papendick.* Outokumpu does not make out a *prima facie* case for a Delaware court to obtain jurisdiction over KAB based on KAS causing KI to be incorporated here and later to buy EcoEnergy's stock.

### Linking a Subsidiary to its Parent

Outokumpu also argues that § 3104(c)(1) is implicated because KI is KAB's alter ego or agent. Under either of these concepts, a parent can be liable and jurisdiction can be obtained over it. *Chaplake, supra,* at 7–8; *Red Sail, supra,* at 8; *Mobil Oil Corp. v. Linear Films, Inc.,* D.Del., 718 F.Supp. 260, 266 (1989).

### Alter Ego Theory

■ Because it is analogous to veil piercing, the alter ego theory requires that the corporate structure cause fraud or similar injustice. *See Applied Biosystems, Inc. v. Cruachem, Ltd.,* D.Del., 772 F.Supp. 1458, 1463 (1991); *Sears,* 744 F.Supp. at 1304; *Mobil Oil,* 718 F.Supp. at 267; *O'Neal v. Huxley Dev.,* D.Del., 558 F.Supp. 462, 467 (1983). Mere dominion and control of the parent over the subsidiary will not support alter ego liability.[2] *Mobil,* 718 F.Supp. at 271 n. 15. The "injustice" must be more than the breach of contract alleged in the complaint, *Id.* at 268, or even the burden of bringing the action in another forum. Outokumpu does not allege that KAB and KI are involved in an elaborate shell game or are otherwise abusing the corporate form to effect a fraud.

Under this theory, there is another barrier for Outokumpu to overcome even on a preliminary showing. Again, it is KAS which owns KI's stock and suggested KI buy EcoEnergy's stock. In other words, to whatever extent it exists, the veil between KAS and KAB would also have to be pierced.

### Agency Theory

■ The second basis by which this Court could obtain jurisdiction over KAB is the agency theory. This jurisdictional hook has long been recognized. *Waters v. Deutz Corp.,* Del.Super., 460 A.2d 1332, 1337–38 (1983). However, under this approach, the jurisdictional conduit under § 3104(c)(1) and/or (2), must involve the transaction of business or performance of work and contracting to supply services in Delaware only with respect to claims which have a nexus to the designated conduct. *LaNuova,* 513 A.2d at 768. In other words, subsections (1) and (2) require that some act must have occurred in Delaware. *Biosystems,* 772 F.Supp. at 1466; *Mobil Oil,* 718 F.Supp. at 271.

There are two types of agency which may give rise to jurisdiction. One is compete

**2.** The degree of control required is "exclusive domination and control ... to the point that [the subsidiary] no longer ha[s] legal or independent significance of [its] own." *See Hart Holding Co. v. Drexel Burnham Lambert, Inc.,* Del.Ch., C.A. No. 11514, Allen C., 1992 WL 127567 (May 28, 1992) at 5, *appeal refused Hart Holding Co. v. Guildford Capital,* Del.Supr., 612 A.2d 158, Holland, J. (1992) (ORDER).

dominion and control. *Mobil Oil,* 718 F.Supp. at 271. These attributes are similar to alter ego which this Court has rejected in this case. The other agency is the standard principal/agent concept often involving but not necessarily requiring a parent and subsidiary. *Id.*

Neither one of these agency concepts applies here. As noted, alter ego has been rejected and the record does not support a *prima facie* case of dominion and control involving the conduct which is the nexus of the claim. KAS caused KI and KEPI to be incorporated or be renamed, as the case may be, in Delaware.

KAB's guarantee related to work on the power plant in Alberta, Canada. There was no work done or any other act performed in Delaware, save the incorporation and renaming acts by KAS. But there is insufficient nexus between those acts in Delaware and the conduct which is the gravamen of this lawsuit—the alleged breach of contract involving the guarantee by KAB involving the Canadian power plant. In other words, the cause of action is unrelated to the acts performed in Delaware. KAB's guarantee under the Guarantee Agreement is not related to the incorporation of KI in Delaware and the purchase of EcoEnergy's stock and corporate name change. *Sears,* 744 F.Supp. at 1307; compare *Papendick,* 410 A.2d at 152.

*Supplying Services in Delaware*

■ Outokumpu contends that KAB's guarantee in the Guarantee Agreement is a contract to supply services in Delaware. Thus, it argues, KAB is subject to this Court's jurisdiction under § 3104(c)(2).

Several courts have held that where a guarantee agreement provides for payment to be made in a forum state, the guarantor has contracted to provide services in the forum state. *See, e.g., A.I. Trade Finance, Inc. v. Petra Bank,* 989 F.2d 76, 81 (2d Cir.1993); *Key Bank v. Patel,* N.D.N.Y., 796 F.Supp. 674, 676 (1992); *Keelean v. Central Bank,* Ala.Supr., 544 So.2d 153, 157 (1989); *Perry v. Central Bank & Trust Co.,* Ky.App., 812 S.W.2d 166, 169 (1991). *Contra Reverse Vending Assocs. v. Tomra Systems U.S., Inc.,* E.D.Pa., 655 F.Supp. 1122, 1127 (1987).

KAB attempts to distinguish these cases on the basis that each involves some connection between the foreign guarantor and the forum state other than the guarantee. However, the guarantor's contacts with the forum state are only stronger where, as here, the guarantor has a direct interest in the Delaware business whose obligation it guarantees. *See, e.g., Bond Leather Co. v. Q.T. Shoe Mfg. Co.,* 764 F.2d 928, 933 (1st Cir.1985); *Koff v. Brighton Pharmaceutical, Inc.,* D.N.J., 709 F.Supp. 520, 526 (1988).[3] Further, KAB's connection to Delaware is not limited to its guarantee alone. KAB was to be operationally responsible for KEPI. However, these responsibilities were concentrated in Canada. None were in Delaware.

The Guarantee Agreement did not specifically identify a location for *payment.* Outokumpu relies on the general rule that a debtor must tender to the creditor where it can find him, *e.g., Gaines Serv. Leasing Corp. v. Ashkenazy,* E.D.N.Y., 635 F.Supp. 805, 807 (1986), as authority for the distinct proposition that, where a payment site is not named in a guarantee agreement, the default rule favors the state of incorporation as the payment site. Otherwise, this case must fall under the general rule that contracts negotiated and performed outside of Delaware will not support personal jurisdiction. *See, e.g., Blue Ball Properties, Inc. v. McClain,* D.Del., 658 F.Supp. 1310, 1316 (1987); *Moore v. Little Giant Indus.,* D.Del., 513 F.Supp. 1043, 1046 (1981), *aff'd.,* 681 F.2d 807 (3d

---

**3.** Outokumpu cites this case as authority that a guarantee can support an assertion of jurisdiction. A close examination of the case does not lend that support. New Jersey individual stockholders sued two Delaware corporations headquartered in Missouri. They were stockholders of a New Jersey corporation which entered into a joint venture with subsidiaries of the Delaware corporations. The joint venture's base was in New Jersey and there had been a number of contacts between the parties in New Jersey. Because of a dispute, the joint venture fell apart. A stock purchase agreement was reached which the Delaware parents guaranteed. Portions of the agreement were governed by Missouri law and portions by New Jersey law. Here, no part of the Agreement was negotiated in Delaware, nor was Delaware law made applicable to any portion of it. The focus of the work being done was at all times in Canada.

Cir.1982); *Fischer v. Hilton,* D.Del., 549 F.Supp. 389, 391 (1982). *See also Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 478, 105 S.Ct. 2174, 2185, 85 L.Ed.2d 528 (1985) (*see, infra.* n. 1).

In light of the language in the Guarantee Agreement indicating that the guarantees were to be governed by Scandinavian law, that service would be made overseas, and that Sweden and Norway were the proper *fora,* this Court is not convinced that KAB's guarantee was or is a contract to perform services within Delaware. Further, the guarantee was also to insure work would be completed at the Alberta, Canada, power plant. KAB personnel went there. Meetings about insuring completion were held in Georgia and Canada. None were held in Delaware. Thus, it seems a weak reed indeed to suggest Delaware should now be the forum or locus for payment.

Under either alter ego or agency, this Court finds that Outokumpu has failed to make a *prima facie* showing of jurisdiction over KAB.

### B

### *Due Process*

■ Even though the Court has determined that Outokumpu cannot meet the first prong of the personal jurisdiction request, the Court finds a discussion of the second test is necessary.

The second prong of the Court's analysis is whether subjecting KAB to jurisdiction in Delaware violates the Due Process Clause of the Fourteenth Amendment. *Sears,* 744 F.Supp. at 1301. This test requires that parties have "fair warning" that a particular activity may subject it to jurisdiction in a given locale, here Delaware. *Shaffer v. Heitner,* 433 U.S. 186, 218, 97 S.Ct. 2569, 2587, 53 L.Ed.2d 683 (1977). Fair warning can be satisfied where a defendant has purposely directed its activities to the residents of the forum state. *Burger King,* 471 U.S. at 472, 105 S.Ct. at 2182.

### *Purposeful Availment*

This "purposeful availment" requirement demands "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Burger King,* 471 U.S. at 475, 105 S.Ct. at 2183 (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–40, 2 L.Ed.2d 1283 (1958)). This "substantial connection", *id.* at 475, 105 S.Ct. at 2183, "must come about by *an action of the defendant purposefully directed toward the forum state.*" *Asahi Metal Ind. v. Superior Ct. of Cal., Solano Cty.,* 480 U.S. 102, 112, 107 S.Ct. 1026, 1032, 94 L.Ed.2d 92 (1987) [emphasis in original]. Purposeful availment may be shown by deliberate, "significant activities" engaged in by the defendant in the forum state, as well as "continuing obligations." *Burger King,* 471 U.S. at 475–76, 105 S.Ct. at 2184. Other than having operational responsibilities for KEPI's performance at the Whitecourt project, KAB has not purposefully availed itself of Delaware protections.[4]

### *Minimum Contacts*

The minimum contacts' requirement of due process demands substantial activity within Delaware, not aggregated contacts with the nation as a whole. *See Chaplake, supra,* at 7; *Applied Biosystems,* 772 F.Supp. at 1462.

Mere ownership of a Delaware subsidiary will not support the minimum contacts' requirement of due process. *See Sears,* 744 F.Supp. at 1306 (*supra,* n. 1); *Chaplake, supra,* at 5 (rejecting idea that "corporate existence" of subsidiary permits jurisdiction over alien parent). Continuous incorporation of a subsidiary in Delaware and annual franchise tax filings will also not meet the due process requirement of minimum contacts. *See Applied Biosystems,* 772 F.Supp. at 1471; *Afros S.p.A. v. Krauss–Maffei Corp.,* D.Del. 624 F.Supp. 464, 468 (1985).

Similarly, KAB's guarantee alone does not establish minimum contacts in the State.

---

4. KAB's guarantee does not reflect purposeful availment. *See Burger King,* 471 U.S. at 478, 105 S.Ct. at 2185. ("If the question is whether an individual's contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot.").

See *Burger King,* 471 U.S. at 478, 105 S.Ct. at 2185. The question becomes whether guaranteeing operational responsibility for performance in another jurisdiction, a Delaware subsidiary can bring a corporation under the State's jurisdiction. Outokumpu cites to no authority for this distinct proposition and this Court is not convinced that minimum contacts have been shown.

### Other Factors

Other factors may reduce the showing of minimum contacts necessary to establish the reasonableness of jurisdiction. The minimum contacts' test emphasizes the notion of "fair play and substantial justice". *Burger King,* 471 U.S. at 476, 105 S.Ct. at 2184 (quoting *International Shoe Co. v. Washington,* 326 U.S. 310, 320, 66 S.Ct. 154, 160, 90 L.Ed. 95 (1945)).

> "[C]ourts in 'appropriate case[s]' may evaluate 'the burden of the defendant,' 'the forum State's interest in adjudicating the dispute,' 'the plaintiff's interest in obtaining convenient and effective relief,' 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies,' and the 'shared interest of the several States in furthering fundamental substantive social policies.' "

*Burger King,* 471 U.S. at 477, 105 S.Ct. at 2184 (quoting *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980)). The practical effect of the *Volkswagen* factors is to make "fair play and substantial justice" primarily a matter for choice of law rules or a change of venue. *Burger King,* 471 U.S. at 477, 105 S.Ct. at 2185. However, the "minimum requirements inherent in the concept of 'fair play and substantial justice' may defeat the reasonableness of jurisdiction even if the defendant has purposefully engaged in forum activities." *Burger King,* 471 U.S. at 477–78, 105 S.Ct. at 2185. Fair play is, thus, a double-edged sword.

The burden of KAB litigating in Delaware is not insubstantial, but it is also not wholly unforeseeable. The same could be said of the burden to Outokumpu of bringing suit in another state or even consolidating its actions in Sweden. Although both Outokumpu and KAB have Scandinavian parents, and KAB is itself Scandinavian, the Court is now faced with the dilemma of one alien corporation suing another in this state, with only the most attenuated connection present, as in *Asahi Metal,* 480 U.S. at 112, 107 S.Ct. at 1032. Thus, the "unique burdens placed upon one who must defend oneself in a foreign legal system," *Asahi Metal,* 480 U.S. at 114, 107 S.Ct. at 1033, are relevant but not dispositive.

While there are Delaware corporations involved in both sides of this dispute, there are primary players who are Scandinavian. The object of their dispute is in Canada. In short, even in the jet, fax, e-mail, internet and overnight delivery age, a case with international implications should cause this Court to pause before imposing its jurisdiction. *United States v. First National Bank,* 379 U.S. 378, 404, 85 S.Ct. 528, 542, 13 L.Ed.2d 365 (1965).

Delaware has an interest in adjudicating contract disputes involving its citizens. *See Koff,* 709 F.Supp. at 528 (noting New Jersey's "strong interest in providing a forum to enforce the contractual obligations of parties who contract with New Jersey residents"). States have an interest in "promoting stable relationships among parties involved in the corporations it charters, as well as in ensuring that investors in such corporations have an effective voice in corporate affairs," *CTS Corp. v. Dynamics Corp.,* 481 U.S. 69, 91, 107 S.Ct. 1637, 1651, 95 L.Ed.2d 67 (1987), as well as a "substantial interest in preventing the corporate form from becoming a shield for unfair business dealing." *Id.* at 93, 107 S.Ct. at 1651–52. *See Sternberg,* 550 A.2d at 1125 (noting special importance of Delaware courts deciding claims owing their (corporate) existence to Delaware law); *In re USA-Cafes, LP. Litigation,* Del.Ch. 600 A.2d 43, 51 (1991) (noting forum state interest in issues of corporate governance). However, Delaware's interest is one factor to be weighed against the interests of the parties to this action.

### Forum Selection Clause

Outokumpu raises three objections to the forum selection/choice-of-law paragraph in

the Guarantee Agreement. First, it correctly notes that "choice of law concerns should [not] complicate or distort the jurisdictional injury." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 778, 104 S.Ct. 1473, 1480, 79 L.Ed.2d 790 (1984) (quoting *Hanson*, 357 U.S. at 254, 78 S.Ct. 1228, 2 L.Ed.2d 1283). Second, Outokumpu cites to a similar New York federal case as supporting its argument that the forum selection clause is "permissive", not "mandatory". *See Credit Alliance v. Crook*, S.D.N.Y. 567 F.Supp. 1462, 1465 (1983). *Cf. Chaplake, supra*, at 10 (involving "exclusively competent" language). Third, Outokumpu asserts that KAB has waived the defense of improper venue by failing to raise it in conjunction with its Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction. *See* Superior Court Civil Rule 12(h)(1)(A).

Outokumpu correctly distinguishes choice of law *analysis* from the jurisdictional inquiry. However, it ignores language in *Burger King* indicating that a choice of law *provision* may nevertheless be considered as relevant to the issue of purposeful availment. *See Burger King*, 471 U.S. at 481–82, 105 S.Ct. at 2187.

Although relevant to a determination of jurisdiction, a forum selection clause is not by itself dispositive. *See Elia Corp. v. Paul N. Howard Co.*, Del.Super., 391 A.2d 214, 216 (1978). The standard for escaping from a forum selection clause identified by the United States Supreme Court is that "trial will be so gravely difficult and inconvenient that [the party seeking a different forum] will for all practical purposes be deprived of his day in court." [5] *The Bremen*, 407 U.S. at 18, 92 S.Ct. at 1917, 32 L.Ed.2d at 513.[6] *See also Papendick*, 410 A.2d at 153 (contrasting plaintiff "of limited means" with defendant "huge multi-national enterprise"). To be sure, *Bremen* and its progeny deal with motions to dismiss for improper venue, not for lack of personal jurisdiction. In either case, the forum selection clause is one factor to be considered and is not dispositive.

Here, Outokumpu does not attempt to show injustice in being forced to bring its cause of action outside of Delaware, choosing instead to distinguish *Bremen* and its progeny as involving contract language that mandates a particular forum, rather than consenting to one. However, this argument is weakened by the clause's reference to Göteborg, Sweden, as "the proper" rather than "a proper" forum; the specification of a particular venue, Göteborg, *see Terra Intern., Inc. v. Mississippi Chem. Corp.*, N.D.Iowa, 922 F.Supp. 1334, 1372 (1996); the use of "shall", rather than "will" or "may", *see id.* at 1373; and the use of similar language in the guarantee executed by plaintiff's Finnish parent. Further, even if the contract language is permissive, rather than mandatory, it is still entitled to "substantial weight", particularly as an expression of the parties' preference. *See Jumara v. State Farm Ins.*, 55 F.3d 873, 880 (3d Cir.1995); *Terra Intern.*, 922 F.Supp. at 1374–75.

The Court is mindful that Outokumpu is a Delaware corporation. Two of the three defendants it is suing are Delaware corporations. The particular corporation in which it is probably most interested is a Swedish corporation, KAB. By determining that this Court lacks jurisdiction over KAB, litigation against KAB will have to occur in Sweden.

But, that is what the guarantee envisioned and Outokumpu cannot be surprised. While split, dual track litigation may result, it cannot have been unforeseen. Outokumpu itself is a subsidiary of a Finnish corporation which underscores any lack of surprise or unfair advantage about where litigation involving KAB must occur.

---

5. Absent such a showing, forum selection clauses are "presumptively valid" and should be "specifically" enforced unless the resisting party "could clearly show that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud and overreaching." *The Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 15, 92 S.Ct. 1907, 1916, 32 L.Ed.2d 513 (1972); accord *Burger King*, 471 U.S. at 472 n. 14, 105 S.Ct. at 2182 n. 15. *Cf. Chaplake, supra*, at 11–12 (suggesting consolidation in alien parent's jurisdiction, rather than subjecting parent to jurisdiction of Delaware courts).

6. *Bremen* has been overruled at the federal level by 28 U.S.C. 1404(a). *See Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22, 29, 108 S.Ct. 2239, 2243, 101 L.Ed.2d 22 (1988).

Outokumpu's suggestion that KAB has waived any defense of improper venue under Superior Court Civil Rule 12(h)(1) by not including it in the motion to dismiss for lack of personal jurisdiction is without merit. Superior Court Civil Rule 12(h)(1) states:

A defense of lack of jurisdiction over the person, improper venue, insufficiency of process, or insufficiency of service of process is waived A) if omitted from a motion in the circumstances described in subdivision (g) [consolidation of defenses in motion], or (B) if it is neither made by motion under this Rule nor included in a responsive pleading or an amendment thereof permitted by Rule 15(a) [amended pleadings] to be made as a matter of course.

There has been no motion to consolidate defenses and the proper occasion for a motion of improper venue has not yet arisen. Venue is not jurisdiction. Jurisdiction is a matter of power and venue is a matter of convenience. A defendant can properly wait to raise a motion of improper venue until this Court has first determined whether it has the jurisdiction to entertain such a motion.

In sum, the Court finds that it lacks jurisdiction over KAB. No utilization of Delaware's long-arm statute applies to the facts of this case. Assuming, *arguendo*, the statute can be applied here, due process considerations bar any action.

## CONCLUSION

For the reasons stated here, the motion of Kvaerner EnviroPower AB to dismiss for lack of personal jurisdiction is **GRANTED.**