# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

PAUL ELTON, LLC, a Delaware )
limited liability company, )
)
   Plaintiff, )
)
  v. )  C.A. No. 2019-0750-KSJM
)
ROMMEL DELAWARE, LLC, a )
Delaware limited liability company, )
ROMMEL MOTORSPORTS )
DELAWARE, INC., a Delaware )
corporation, and DAVID ROMMEL, )
)
   Defendants. )

## MEMORANDUM OPINION

Date Submitted: February 4, 2020
Date Decided: May 7, 2020

Richard L. Abbott, ABBOTT LAW FIRM, Hockessin, Delaware; *Counsel for Plaintiff Paul Elton, LLC*.

"J" Jackson Shrum, JACK SHRUM, P.A., Wilmington, Delaware; *Counsel for Defendants Rommel Delaware, LLC, Rommel Motorsports Delaware, Inc., and David Rommel*.

**McCORMICK, V.C.**

In 2008, the plaintiff leased property holding a Harley-Davidson dealership to defendant Rommel Motorsports Delaware, Inc. ("Motorsports"). The lease agreement gave Motorsports an option to purchase the parcel of land on which the dealership and other buildings were located. Upon exercise of the option, Motorsports would pay a fixed price up-front and half of any proceeds later derived from the lease or sale of the additional space holding the other buildings. The lease provided that Motorsports could be held liable for any assignee's failure to fulfill Motorsports' obligations. Defendant David Rommel signed the lease agreement on behalf of Motorsports and as a guarantor.

In 2010, Motorsports assigned its option to defendant Rommel Delaware, LLC ("Rommel Shell"), which then exercised the option and purchased the property. The purchase agreement preserved the plaintiff's right to the proceeds from the sale of the additional space. Nothing in the agreement released Motorsports, as assignor, or Rommel, as guarantor, from liability for Rommel Shell's failure to honor the plaintiff's proceeds right.

In 2017, Rommel Shell agreed to sell the property, including the additional space, to a third party. By April 2018, Rommel Shell had received all of the governmental approvals necessary to ensure final approval of the redevelopment project. The sale closed on April 17, 2018. Rommel Shell ultimately distributed the proceeds of the sale to Rommel and Motorsports, leaving itself insolvent.

The plaintiff learned of these events in October 2018 and demanded payment of the proceeds from the sale. Rommel refused. The plaintiff brought this action claiming that the defendants breached the lease and purchase agreements, defrauded the plaintiff, and unjustly enriched themselves. The plaintiff requests declaratory judgments, specific performance of the agreements, a constructive trust, piercing Rommel Shell's veil, and damages. The defendants moved to dismiss the complaint in its entirety for failure to state a claim upon which relief may be granted. This decision grants and denies the motion in part. With the exception of one permutation, the complaint states multiple claims for breach of contract, and the plaintiff may seek declaratory relief, specific performance, and damages on those claims. The complaint fails to state a claim for fraud, unjust enrichment, or veil piercing.

## I. FACTUAL BACKGROUND

The facts are drawn from the Verified Complaint (the "Complaint")[1] and documents it incorporates by reference.

### A. The Lease Agreement

In May 2008, Motorsports, a Delaware corporation owned and controlled by Rommel, purchased a Harley-Davidson dealership in New Castle, Delaware. The dealership was located on a portion of a 5.75 acre plot (the "Property") that also held

---

[1] C.A. No. 2019-0750-KSJM, Docket ("Dkt.") 1, Verified Complaint ("Compl.").

a vacant restaurant, two vacant hotels, a vacant check-in facility, and a vacant auxiliary building formerly used for the hotels' operations (collectively, the "Additional Space").[2]

On May 29, 2008, Paul Elton, LLC ("Plaintiff"), a Delaware limited liability company, and Motorsports executed a lease agreement comprising a "Lease Summary Page," a "Lease," and three exhibits.[3] Each document was binding on the parties and incorporated the other documents by reference, and this decision refers to the collection of documents as the "Lease Agreement."[4]

Motorsports committed to lease the portion of the Property holding the dealership for an initial term of fifteen years.[5] During the lease term, Motorsports would hold an option to purchase the Property (the "Option"),[6] the terms of which were set forth in Section K of the Lease Agreement. The Option provision set an initial purchase price of $8.5 million plus adjustments for other factors.[7] As further

---

[2] *Id.* ¶ 11.

[3] *See* Compl. Ex A.

[4] The Lease Summary Page is subdivided alphabetically. The Lease is subdivided numerically. Because these different subdivisions are easily distinguishable, this decision cites generally to the Lease Agreement and then the specific section in either the Lease Summary Page of the Lease.

[5] Lease Agreement § E.

[6] *See id.* §§ K, 41.

[7] *Id.* § K.

3

consideration, the Option provision gave Plaintiff the following proceeds right (the

"Proceeds Right"):

> If [Motorsports] exercises its Option to Purchase before any leases for Additional Space are executed, and if, within ninety-nine years after the date of settlement whereby [Motorsports] becomes the owner of the Property, [Motorsports] shall pursue, with due diligence, commercially reasonable efforts to lease Additional Space, [Motorsports] executes a lease or leases for Additional Space or sells Additional Space, then [Plaintiff] shall be entitled to receive 50% the value of the lease(s) or sales for Additional Space.[8]

Under the Option provision, the parties have fifteen days from the date of the sale or

lease to agree on the value Plaintiff should receive under the Proceeds Right. If the

parties are unable to agree, the provision describes an alternative dispute resolution

process involving competing real estate appraisals and the possibility of a neutral

third appraisal.

The Lease Agreement also contains an anti-assignment clause, which includes

the following agreed-upon term:

> Unless released in writing by [Plaintiff], [Motorsports] shall remain primarily liable for all liabilities, obligations, covenants, representations and warranties under this Lease, provided, however, [Motorsports'] obligations may not be enlarged or extended by any agreement of any assignee or subtenant with [Plaintiff]. Subtenants or assignees shall become liable to [Plaintiff] for all liabilities, obligations, convents [sic], representations and

---

[8] *Id.*

4

warranties of [Motorsports] hereunder, without relieving [Motorsports'] liability hereunder . . . .[9]

Thus, under this term, Motorsports would continue to be liable for any breach of the Lease Agreement by an assignee.

Rommel signed the Lease Agreement on behalf of Motorsports. He also signed the Lease Agreement on behalf of himself as guarantor for any of Motorsports' liabilities. Rommel's guaranty was "continuing and irrevocable."[10] "In the event the Lease [was] assigned in any manner," Rommel's guaranty would "continue in full force and effect unless a mutual release of [the] Guaranty [was] executed by [Rommel] and [Plaintiff]."[11]

## B. The Purchase Agreement

In July 2010, Motorsports assigned the Option to Rommel Shell, a single-member Delaware limited liability company. Rommel Shell then exercised the Option and entered into a Purchase Agreement with Plaintiff.[12]

The Purchase Agreement contains four recitals which are "incorporated by reference and made a part of [the Purchase] Agreement"[13]:

> A. WHEREAS, [Plaintiff] and [Motorsports] previously entered into a lease agreement (the

---

[9] *Id.*§ 18.

[10] *Id.* § 43.

[11] *Id.*

[12] *See* Compl. Ex. B (the "Purchase Agreement").

[13] *Id.* § 1.

5

"Lease Agreement") with respect to the property described below; and

B.     WHEREAS, the Lease Agreement contained an option to purchase; and

C.     WHEREAS, [Motorsports] has assigned it's [sic] rights to the Option to Purchase to [Rommel Shell]; and

D.     WHEREAS, the parties have renegotiated the Purchase Price and Terms of the Option to Purchase.[14]

Following the recitals, the Purchase Agreement states that Rommel Shell will pay Plaintiff $8 million. The Purchase Agreement then restates the Proceeds Right and other obligations taken from the Option provision in a section titled "Additional Consideration":

> After the date of Settlement [Rommel Shell] shall pursue, with due diligence, commercially reasonable efforts to lease or sell [the Additional Space]. It is specifically understood [Rommel Shell's] right to maximize the use of the Property for its motorcycle business operations is paramount and that [Rommel Shell's] commercially reasonable efforts shall be interpreted in that context.
>
> If [Rommel Shell] executes a lease or leases for Additional Space or sells Additional Space then [Plaintiff] shall be entitled to receive 50% the value [sic] of the lease(s) or sales for Additional Space. . . .
>
> In the event of a sale of the Property by [Rommel Shell], this provision shall become null and void with respect to a subsequent purchaser of the Property unless the subsequent purchaser is an entity in which [Rommel Shell]

---

[14] *Id.* Recitals A–D (emphasis omitted).

6

or its principals retain an interest or the sale is not an arms length [sic] transaction.

In connection with [Rommel Shell's] pursuit of utilizing Additional Space on the Property, [Rommel Shell] shall be entitled to consider the quality of the proposed Tenant for the Additional Space, the nature of the business operation and compatibility with the primary use on the site. Under no circumstances shall [Rommel Shell] be obligated to proceed with any additional use on the Property that is not presently permitted, where required governmental approval would materially and adversely affect [Rommel Shell's] ability to utilize the balance of the Property.

This provision shall be applicable for a period of ninety-nine (99) years from the date of Settlement.[15]

The Additional Consideration provision also describes the same dispute resolution process set out in the Option provision to govern disputes over the amount owed in the event of a sale or lease of the Additional Space.

The Purchase Agreement's integration clause notes that the Purchase Agreement and "those provisions of the Lease specifically incorporated by reference herein" comprise the entire agreement.[16] Rommel signed the agreement as the "sole member" of Rommel Shell.[17] Unlike the Lease Agreement, Rommel did not sign the Purchase Agreement as guarantor.

---

[15] *Id.* § 4 (formatting altered).

[16] *Id.* § 13.

[17] *Id.* § 18.

On August 12, 2010, Plaintiff and Rommel Shell closed on the purchase of the Property.

## C. The Sale

In 2017, Rommel Shell entered into an agreement to sell the Property for $7.6 million to third party 2160 New Castle Avenue, LLC. The third party wanted to redevelop the Additional Space into a gas station and convenience store. Closing was conditioned on Rommel Shell's ability to obtain all governmental approvals necessary to ensure final approval of the redevelopment (the "Discretionary Approvals"). Neither Rommel Shell, Motorsports, nor Rommel (collectively, "Defendants") ever notified Plaintiff of the agreement to sell the Property. Rommel Shell obtained the Discretionary Approvals in April 2018, and Rommel Shell and the third party closed on the sale of the Property on April 17, 2018 (the "Sale").

In connection with the Sale, Rommel Shell entered into a multi-year lease of the portion of the Property holding the dealership to continue running the Harley-Davidson business. But immediately after the redevelopment was formally approved in June 2018, Rommel Shell terminated its lease and closed the Harley-Davidson business. According to the Complaint, Rommel Shell then distributed the proceeds of the Sale to Rommel or Motorsports, making Rommel Shell insolvent.

In October 2018, Plaintiff learned of the Sale and demanded its share of the proceeds under the Proceeds Right. Defendants responded by claiming "that there

was nothing to pay" because "no adjacent property was involved and the Property sold at a significant loss."[18] Plaintiff disagreed and retained a certified appraiser in an attempt to engage Defendants in the dispute resolution process. The appraiser valued the Additional Space at $5 million.

### D. This Litigation

Plaintiff filed this action on September 18, 2019. The Complaint asserts six Counts:

- Count I seeks specific performance of the alternative dispute resolution process described in the Option provision of the Lease Agreement and the Additional Consideration provision of the Purchase Agreement.

- Count II asserts that Defendants committed common law and equitable fraud by failing to disclose the redevelopment of the Additional Space and "then representing that no sale of the Additional Space took place."[19]

- Count III seeks a declaratory judgment that the Sale triggered the Proceeds Right.

- Count IV asserts that Defendants were unjustly enriched by the Sale and seeks a constructive trust or equitable lien.

- Count V seeks to pierce Rommel Shell's veil and hold Rommel and Motorsports liable for Rommel Shell's failure to pay Plaintiff under the Proceeds Right.

- Count VI asserts that Defendants breached the Option provision of the Lease Agreement and the Additional Consideration provision of the Purchase Agreement.

---

[18] Compl. ¶ 41.

[19] *Id.* ¶ 61.

Defendants moved to dismiss the Complaint on October 18, 2019.[20] The parties fully briefed the motion by December 31, 2019,[21] and the Court heard oral arguments on February 4, 2020.[22]

## II. LEGAL ANALYSIS

Defendants have moved to dismiss the Complaint pursuant to Court of Chancery Rule 12(b)(6). Under Rule 12(b)(6), the Court may grant a motion to dismiss if the Complaint "fail[s] to state a claim upon which relief can be granted."[23] "[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[24] When considering such a motion, the Court must "accept all well-pleaded factual allegations in the [c]omplaint as true . . . , draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[25] The Court, however, need not "accept conclusory

---

[20] Dkt. 14, Motorsports' Mot. to Dismiss the Compl.; *see* Dkt. 20, Rommel Shell and Rommel's Mot. to Dismiss the Compl.

[21] Dkt. 24, Defs.' Opening Br. in Supp. of Mots. to Dismiss ("Defs.' Op. Br."); Dkt. 27, Pl.'s Answering Br. in Opp'n to Defs.' Mots. to Dismiss ("Pl.'s Ans. Br."); Dkt. 28, Defs.' Reply Br. in Supp. of Their Mots. to Dismiss ("Defs.' Reply Br.").

[22] Dkt. 31, Oral Arg. on Defs.' Mot. to Dismiss ("Oral Arg. Tr.").

[23] Ct. Ch. R. 12(b)(6).

[24] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

[25] *Id.* at 536.

allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[26]

Defendants seek to dismiss each of Plaintiff's six counts. This decision first addresses Plaintiff's claims for breach of contract, which supply the foundation for the other claims, and then addresses Plaintiff's claims for specific performance, declaratory judgment, fraud, unjust enrichment, and veil-piercing.

## A.    Breach of Contract

Plaintiff contends that Defendants breached the Option provision of the Lease Agreement and the Additional Consideration provision of the Purchase Agreement by failing to pay Plaintiff under the Proceeds Right, failing to participate in the alternative dispute resolution process, and "failing to timely and diligently pursue . . . a subsequent lease or sale" of the Additional Space.[27]

"In order to survive a motion to dismiss for failure to state a breach of contract claim, the plaintiff must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff."[28] Delaware courts follow the objective

---

[26] *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011), *overruled on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255 (Del. 2018).

[27] Compl. ¶ 81 (Count VI).

[28] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

theory of contracts, giving words "their plain meaning unless it appears that the parties intended a special meaning."[29]

At the motion to dismiss stage, "the trial court cannot choose between two differing reasonable interpretations of ambiguous provisions."[30] Dismissal is appropriate on a Rule 12(b)(6) motion "only if the defendants' interpretation is the *only* reasonable construction as a matter of law."[31]

### 1. The Complaint States a Claim for Breach of the Proceeds Right Against Rommel Shell.

Rommel Shell was a party to the Purchase Agreement. The Additional Consideration provision of the Purchase Agreement provides that if Rommel Shell "sells Additional Space then [Plaintiff] shall be entitled to receive 50% the value [sic] of . . . sales for Additional Space."[32] Rommel Shell sold the Property, which included the Additional Space. Therefore, under the plain language of the Purchase Agreement, the Sale triggered the Proceeds Right and Plaintiff has the right to 50% of the proceeds of the Sale that derived from the value of the Additional Space.

---

[29] *Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 104 (Del. 2013); *see Estate of Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) ("[A] contract's construction should be that which would be understood by an objective, reasonable third party." (internal quotation marks omitted)).

[30] *VLIW Tech.*, 840 A.2d at 615.

[31] *Id.*

[32] Purchase Agreement § 4.

Defendants contend that the Sale did not trigger the Proceeds Right because the Lease Agreement and the Purchase Agreement describe a sale of the Additional Space, not a sale of the Property. In other words, they read the Additional Consideration provision as triggering the Proceeds Right only upon a sale of *only* the Additional Space. But the plain language of the agreement does not use the modifier "only." And reading the agreement to impose the modifier "only" would allow a party to easily evade its terms. For example, if a sale of *only* the Additional Space triggered the Proceeds Right, then a party could arguably avoid triggering the Proceeds Right by including in a sale of the Additional Space *any* additional assets. Such an outcome would make little sense.[33]

Alternatively, Defendants argue that instead of triggering the Proceeds Right, the Sale made the right null and void. In support of this argument, Defendants cite a clause in the Additional Consideration provision that states, "[i]n the event of a sale of the Property by [Rommel Shell], this provision shall become null and void with respect to a subsequent purchaser of the Property unless the subsequent purchaser is an entity in which [Rommel Shell] or its principals retain an interest or the sale is not an arms length [sic] transaction."[34] That clause is irrelevant to this

---

[33] *Estate of Osborn*, 991 A.2d at 1160 (describing the absurdity canon of contract interpretation).

[34] Purchase Agreement § 4.

13

case. The clause precludes Plaintiff from seeking the proceeds of a sale when the Additional Space has already been sold to a third party and the third party is subsequently selling the Additional Space. Here, Plaintiff is seeking proceeds from Rommel Shell in the first sale of the Additional Space following exercise of the Option, which is the express situation that triggers the Proceeds Right. Interpreting the clause as Defendants do would eliminate the Proceeds Right entirely.

Plaintiff alleges that Rommel Shell failed to pay Plaintiff any proceeds from the Sale. Defendants fail to supply the only reasonable interpretation of the Purchase Agreement. The Complaint thus states a claim against Rommel Shell for breach of the Proceeds Right.

> **2. The Complaint States a Claim for Breach of the Proceeds Right Against Motorsports and Rommel.**

Defendants argue that Motorsports and Rommel cannot be held in breach of the Proceeds Right on the theories that neither Motorsports nor Rommel are parties to the Purchase Agreement and that the Purchase Agreement superseded the Lease Agreement.

Although it is true that Motorsports and Rommel are not parties to the Purchase Agreement, it is false that the Purchase Agreement superseded the Lease Agreement. Defendants do not support this argument with a single provision in the Purchase Agreement. The Purchase Agreement's integration clause does not include the typical boilerplate language stating that the agreement supersedes all earlier or

14

contemporaneous agreements.[35] Instead, the plain language of the Purchase Agreement indicates that the Purchase Agreement intended to preserve the rights and obligations stated under the Lease Agreement by incorporating those provisions by reference. As assignor and guarantor of the rights and obligations that arose under the Lease Agreement, Motorsports and Rommel remain liable for breach.

It is reasonably conceivable that Motorsports breached its obligations under the Lease Agreement. Motorsports assigned the Option to Rommel Shell. According to the anti-assignment clause of the Lease Agreement, the assignment did

---

[35] *Compare id.* § 13 ("[Rommel Shell] and [Plaintiff] agree that they have read and fully understand this Agreement, including those provisions of the Lease specifically incorporated by reference herein and that it contains the entire agreement between them with respect to the matters contained therein."), *with, e.g.*, *Cabela's LLC v. Wellman*, 2018 WL 5309954, at *2, *6 (Del. Ch. Oct. 26, 2018) ("This Agreement is a complete agreement between the parties and supersedes all prior discussion, negotiations, and agreements with regard to the subject matter herein, whether oral or written." (internal quotation marks and emphasis omitted)), *and BioVeris Corp. v. Meso Scale Diagnostics, LLC*, 2017 WL 5035530, at *3 (Del. Ch. Nov. 2, 2017) ("This Agreement constitutes the entire agreement among the parties with respect to the subject matter hereof, and supersedes all prior or contemporaneous oral or written agreements, understandings or representations." (internal quotation marks omitted)), *aff'd*, 202 A.3d 509 (Del. 2019) (TABLE), *and TrueBlue, Inc. v. Leeds Equity P'rs IV, LP*, 2015 WL 5968726, at *8 (Del. Super. Sept. 25, 2015) ("This Agreement . . . constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, among the Parties with respect to the subject matter hereof and thereof." (internal quotation marks omitted)), *and Simplexity, LLC v. Zeinfeld*, 2013 WL 5702374, at *3 (Del. Ch. Oct. 17, 2013) ("This Agreement supersedes all previous letters, offers, quotations, negotiations and agreements in respect of its subject matter including, by way of example and not limitation, the Memorandum of understanding entered into by the Parties . . . ." (internal quotation marks omitted)), *and Vornado PS, L.L.C. v. Primestone Inv. P'rs, L.P.*, 821 A.2d 296, 320–21 (Del. Ch. 2002) (explaining that the integration clause "provided that the Agreement 'supersede[s] all prior agreements and understanding both written and oral, among the parties . . .'"), *aff'd*, 822 A.2d 397 (Del. 2003) (TABLE).

not release Motorsports from liability for Rommel Shell's failure to honor the obligations arising under the Option:

> Unless released in writing by [Plaintiff], [Motorsports] shall remain primarily liable for all liabilities, obligations, covenants, representations and warranties under this Lease, provided, however, [Motorsports'] obligations may not be enlarged or extended by any agreement of any assignee or subtenant with [Plaintiff]. Subtenants or assignees shall become liable to Landlord for all liabilities, obligations, convents [sic], representations and warranties of [Motorsports] hereunder, without relieving [Motorsports'] liability hereunder . . . .[36]

When Motorsports assigned the Option to Rommel Shell, Plaintiff did not release Motorsports from liability for Rommel Shell's failure to fulfill any obligations that arose with exercising the Option. One of those obligations was honoring the Proceeds Right. The Purchase Agreement did not enlarge or extend the Proceeds Right; the right remained exactly the same. As the assignor of that obligation, Motorsports remains liable for Rommel Shell's failure to honor it. Therefore, the Complaint pleads that Motorsports breached the Lease Agreement as assignor by failing to ensure Plaintiff received its share of the proceeds from the Sale.

It is also reasonably conceivable that Rommel breached his obligations under the Lease Agreement. Under the Lease Agreement, Rommel agreed to "guarantee

---

[36] Lease Agreement § 18.

all of the obligations of [Motorsports] under the Lease including, but not limited to, the payment of rent and of all other payments, covenants and other obligations of [Motorsports] under or pursuant to the Lease."[37] The Lease Agreement explains that "[t]his is a continuing and irrevocable Guaranty and the rights of [Plaintiff] hereunder may be exercised as often as necessary, as well as after the expiration of the original term of the Lease and/or during any extension or renewal of the Lease."[38] The Lease Agreement further provides that "[i]n the event the Lease is assigned in any manner, this Guaranty shall continue in full force and effect unless a mutual release of this Guaranty is executed by [Rommel] and [Plaintiff] or [Plaintiff's] successors and/or assigns."[39]

As guarantor, Rommel guaranteed the obligations of Motorsports under the Lease Agreement. The assignment of Motorsports' obligations had no effect on Rommel's guaranty. Plaintiff never released Rommel from his obligations. Therefore, the Complaint pleads that Rommel breached the Lease Agreement as guarantor by failing to ensure Plaintiff received its share of the proceeds from the Sale.

---

[37] *Id.* § 43.

[38] *Id.*

[39] *Id.*

The Complaint thus states a claim against Motorsports and Rommel for breach of the Proceeds Right.

### 3. The Complaint States a Claim for Failure to Comply with the Alternative Dispute Resolution Clause.

Defendants rely on the same arguments to support dismissal of Plaintiff's claim for breach of the alternative dispute resolution clause.[40] This decision has already addressed these arguments, holding that it is reasonably conceivable that the Sale triggered the Proceeds Right and that Rommel and Motorsports are liable for Rommel Shell's breach of its obligations under the Additional Consideration provision so long as they did not enlarge or extend those in the Option provision.

Under the Purchase Agreement, the alternative dispute resolution clause applies when "the parties cannot reach an agreement on value [of proceeds owed to Plaintiff] within fifteen (15) days following the date of a transaction leasing or selling Additional Space."[41] In that situation, the Additional Consideration provision states that

> each party shall, within five (5) days, select an appraiser to complete an appraisal of the value of the lease for the Additional Space. The appraisals shall be completed within sixty (60) days of the time of [sic] the appraisers selected. In the event that the difference of the two appraisals is five percent (5%) or less, then the average of the two appraisals shall be the price. If the difference is

---

[40] *See* Defs.' Op. Br. at 19; Defs.' Reply Br. at 14–15; *see also* Oral Arg. Tr. at 9–10, 18–20, 43–46.

[41] Purchase Agreement § 4.

more than five percent (5%), then the two appraisers shall, within ten (10) days, select a third appraiser and the average of the two closest appraisals shall be the [value of the Additional Space]. All appraisers selected shall be licensed commercial real estate appraisers in the State of Delaware having at least ten (10) years experience. The costs of the three appraisals shall be shared equally between [Rommel Shell] and [Plaintiff].[42]

The Complaint alleges that Defendants refused to pay Plaintiff any proceeds from the Sale because they did not believe the Proceeds Right had been triggered "and the Property sold at a significant loss . . . [leaving] nothing to pay [Plaintiff]."[43] Plaintiff responded by attempting to engage in the alternative dispute resolution process. Defendants refused to engage, which violates the alternative dispute resolution clause because the parties were in dispute over the value of the Additional Space.

The alternative dispute resolution process described in the Purchase Agreement is identical to the process described in the Lease Agreement.[44] The

---

[42] Purchase Agreement § 4. Instead of using the term "value of the Additional Space," Section 4 of the Purchase Agreement uses the term "Option Price." The Purchase Agreement never uses that term again. Use of the term "Option Price" makes it reasonable to infer that the parties just copied and pasted the alternative dispute resolution clause from the Lease Agreement and attempted to adapt it to the Purchase Agreement. The Lease Agreement had used the term Option Price because its alternative dispute resolution clause was drafted to resolve disputes over the price at which Motorsports could exercise its option, and then incorporated by reference to apply to disputes over the value of the Additional Space in the event the Proceeds Right was triggered. *See* Lease Agreement § K.

[43] Compl. ¶ 41.

[44] Lease Agreement § K ("If the parties cannot reach an agreement as to [the value of the lease(s) or sales for the Additional Space] within 15 days [of the transaction], then each

19

Purchase Agreement neither enlarged nor extended Motorsports' or Rommel's obligations under the Lease Agreement, meaning that they remain liable as assignor and guarantor. The Complaint thus states a claim against Defendants for failure to comply with the alternative dispute resolution clause.

### 4. The Complaint Partially States a Claim for Failure to Pursue a Lease or Sale of the Additional Space.

Again, Defendants rely on the same arguments to support dismissal of Plaintiff's claim for breach of the obligation under the Purchase Agreement to "pursue, with due diligence, commercially reasonable efforts to lease or sell [the Additional Space]."[45] This decision has already addressed these arguments, holding that it is reasonably conceivable that the Sale triggered the Proceeds Right and that Rommel and Motorsports are liable for Rommel Shell's breach of the obligations under the Additional Consideration provision so long as they did not enlarge or

---

party shall, within 5 days, select an appraiser to complete an appraisal of the value of the lease [or sale] for only the Additional Space . . . . The appraisals shall be completed within sixty (60) days of the time the appraisers are selected. In the event that the difference of the appraisals is five percent (5%) or less, then the average of the two appraisals shall be the [value of the Additional Space]. If the difference is more than 5%, then the two appraisers shall, within 10 days, select a third appraiser and the average of the two closest appraisals shall be the [value of the Additional Space]. All appraisers selected shall be licensed commercial real estate appraisers in the State of Delaware having at least ten years experience. The costs of the three appraisals shall be shared equally between [Plaintiff] and [Motorsports].")

[45] Purchase Agreement § 4; *see* Defs' Op. Br. at 19; Defs' Reply Br. at 14–15 (repeating arguments in reply brief); *see also* Oral Arg. Tr. at 9–10, 18–20, 43–46. For example, Defendants did not argue that Plaintiff failed to allege facts that amounted to a breach of the commercially reasonable efforts clause.

extend those in the Option provision. The Complaint thus states a claim against Rommel Shell for failure to pursue a lease or sale of the Additional Space.

The analysis for Motorsports and Rommel is less straightforward because the Purchase Agreement extended and reframed the obligations owed under the Lease Agreement. The Lease Agreement required Motorsports to "pursue, with due diligence, commercially reasonable efforts to lease Additional Space."[46] In contrast, the Purchase Agreement required Rommel Shell to "pursue, with due diligence, commercially reasonable efforts to lease *or sell* [the Additional Space]."[47] The requirement to pursue a sale of the Additional Space is an expansion of the obligations originally placed upon Motorsports.

The Lease Agreement does not address, nor did the parties brief, whether the scope of obligations imposed by the Purchase Agreement affects the claims against Motorsports. This decision interprets the provision in Plaintiff's favor as exposing Motorsports to potential liability for the original obligations. Under this interpretation of the Lease Agreement, the Complaint states a claim against Motorsports for failing to pursue commercially reasonable efforts to lease the Additional Space. The Complaint fails to state a claim against Motorsports for failing to pursue commercially reasonable efforts to sell the Additional Space.

---

[46] Lease Agreement § K.

[47] Purchase Agreement § 4 (emphasis added).

21

The analysis for Rommel is the same. Rommel is liable as guarantor only for Motorsports' failure to satisfy its obligations. The Complaint thus states a claim against Rommel for failing to pursue commercially reasonable efforts to lease the Additional Space. However, the Complaint fails to state a claim against Rommel for failing to pursue commercially reasonable efforts to sell the Additional Space.

## B. Specific Performance

Plaintiff seeks an order requiring Defendants to specifically perform in accordance with the Purchase Agreement's alternative dispute resolution clause.[48] Specific performance requires "a valid contract," a plaintiff that is "ready, willing, and able to perform," and a "balance of the equities" that tips in the plaintiff's favor.[49]

This decision has already held that it is reasonably conceivable that the Sale triggered the Proceeds Right and that Plaintiff stated a claim against Defendants for failure to comply with the alternative dispute resolution clause. Plaintiff's appraisal of the Additional Space indicates its willingness to perform. Plaintiff should be able to obtain the benefit of the parties' agreed-upon, cost-effective dispute resolution process, and Defendants have pointed to no reason that specific performance

---

[48] Compl. ¶¶ 57–58 (Count I).

[49] *Estate of Osborn*, 991 A.2d at 1158.

"would . . . cause even greater harm than it would prevent."[50]  The Complaint thus states a claim for specific performance.

### C.  Declaratory Judgment

Plaintiff seeks a declaratory judgment that the Sale triggered the obligations in the Option provision and the Additional Consideration provision.[51]  Defendants' only argument for dismissal of this claim is based on the premise that there was no breach of contract.[52]  This decision has already addressed that issue, holding the Complaint pleads claims for breach.  The Complaint thus states a claim for declaratory judgment.

### D.  Fraud

Plaintiff contends that Defendants committed both common law and equitable fraud by "failing to disclose" the redevelopment of the Additional Space "and then representing that no sale of Additional Space took place."[53]  This decision first

---

[50] *Id.* at 1161 (internal quotation marks omitted).

[51] Compl. ¶ 67 (Count III).

[52] *See* 10 *Del. C.* § 6501; *Rollins Int'l, Inc. v. Int'l Hydronics Corp.*, 303 A.2d 660, 662–63 (Del. 1973) (explaining that a declaratory judgment requires an "actual controversy" with the following "prerequisites": "(1) It must be a controversy involving the rights or other legal relations of the party seeking declaratory relief; (2) it must be a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim; (3) the controversy must be between parties whose interests are real and adverse; (4) the issue involved in the controversy must be ripe for judicial determination.").

[53] Compl. ¶ 61 (Count II).

addresses the claims under the framework of common law fraud and then turns to

equitable fraud.

### 1. The Complaint Fails to State a Claim for Common Law Fraud.

To state a claim for common law fraud, a complaint must plead the following

elements:

1) a false representation, usually one of fact, made by the defendant;

2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth;

3) an intent to induce the plaintiff to act or to refrain from acting;

4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and

5) damage to the plaintiff as a result of such reliance.[54]

The first element can also be satisfied if a defendant deliberately conceals a material

fact or remains silent about a material fact in the face of a duty to speak.[55]

Under Court of Chancery Rule 9(b), "[i]n all averments of fraud or mistake,

the circumstances constituting fraud or mistake shall be stated with particularity.

Malice, intent, knowledge and other condition of mind of a person may be averred

---

[54] *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983).

[55] *Id.*; *accord Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149 (Del. 1987).

24

generally."[56]   Delaware law recognizes that "[t]he test of whether an attempted pleading of fraud states sufficient 'circumstances' to satisfy Rule 9 is not scientific."[57]

> Generally, it may be said that an allegation of fraud is legally sufficient under Rule 9(b) if it informs defendants of the precise transactions at issue, and the fraud alleged to have occurred in those transactions, so as to place defendants on notice of the precise misconduct with which they are charged.[58]

A plaintiff can satisfy this principle by alleging "(1) the time, place, and contents of the false representation; (2) the identity of the person making the representation; and (3) what the person intended to gain by making the representations."[59]

Plaintiff first alleges that Defendants represented that "no sale of Additional Space took place."[60]  The Complaint does not allege this fact with any particularity. For example, the Complaint does not allege when this representation was made or

---

[56] Ct. Ch. R. 9(b).

[57] *Kahn Bros. & Co., Inc. Profit Sharing Plan & Tr. v. Fischbach Corp.*, 1989 WL 109406, at *4 (Del. Ch. Sept. 19, 1989).

[58] *Id.* (internal quotation marks, alterations, and citations omitted); *accord ABRY P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006) ("Essentially, the plaintiff is required to allege the circumstances of the fraud with detail sufficient to apprise the defendant of the basis for the claim."); *H-M Wexford LLC v. Encorp.*, 832 A.2d 129, 145 (Del. Ch. 2003); *see Cont'l Ill. Nat'l Bank & Tr. Co. of Chi. v. Hunt Int'l Res. Corp.*, 1987 WL 55826, at *6 (Del. Ch. Feb. 27, 1987) ("[A] plaintiff need not allege evidentiary details.").

[59] *ABRY*, 891 A.2d at 1050.

[60] Compl. ¶ 61.

by whom. Besides this particularity defect, the Complaint never alleges that Plaintiff relied on Defendants' representation. Plaintiff did the exact opposite: it hired an appraiser, valued the Additional Space, and brought this action.

Plaintiff next alleges that Defendants committed common law fraud by failing to disclose the redevelopment of the Additional Space.[61] "Generally, there is no duty to disclose a material fact or opinion, unless the defendant had a duty to speak."[62] "An affirmative obligation to speak only arises where there is 'a fiduciary or other similar relation of trust and confidence' between the parties."[63] "In other words, there is no duty to speak absent special circumstances."[64]

Plaintiff argues that Defendants had a duty to speak because the Purchase Agreement states that "[t]ime is of the essence with regard to all provisions of this

---

[61] *Id.*

[62] *Nicolet*, 525 A.2d at 149; *see Prairie Capital III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 52 (Del. Ch. 2015) ("In an arms' length contractual setting . . . , a party has no affirmative duty to speak."); *Restatement (Second) of Torts* § 551(1) (Am. L. Inst. 1977) ("One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.").

[63] *Prairie Capital*, 132 A.3d at 52 (quoting 37 C.J.S. *Fraud* § 33, Westlaw (database updated 2015)).

[64] *Corp. Prop. Assocs. 14 Inc. v. CHR Hldg. Corp.*, 2008 WL 963048, at *6 (Del. Ch. Apr. 10, 2008).

Agreement"[65] and describes a procedure for providing notices.[66] Yet neither of these provisions impose a duty on Defendants to notify Plaintiff about the development or sale of the Additional Space. Instead, they set guidelines for providing notice when required to do so. Plaintiff did not raise any other argument for inferring that Defendants were under a duty to speak.

In briefing, Plaintiff argues that its fraud claims should survive because of alleged "badges of fraud,"[67] a phrase that generally refers to circumstances that would allow a court to find (or, at the pleading stage, infer) the intent required to support a claim of fraud.[68] Recasting Plaintiff's claims in this manner does not

---

[65] Purchase Agreement § 11.

[66] *Id.* § 14.

[67] Pl.'s Ans. Br. at 24 (identifying the following alleged "badges of fraud": "1) the structuring and timing of the [Sale] and [government approvals] in an attempt to hide the sale of Additional Space; 2) rendering [Rommel Shell] insolvent to avoid paying the [Proceeds Right]; 3) failing to timely notify [Plaintiff] of the [Sale] so as to further the fraudulent scheme; 4) lack of timely disclosure to [Plaintiff] of the pursuit of the Additional Development; 5) preventing [Plaintiff] from taking action to prevent the fraudulent scheme from being carried out; 6) the inability of [Plaintiff] to . . . seek equitable relief in Court; or 7) selling the Additional Space without retaining adequate reserves to pay [Plaintiff] the [Proceeds Right]").

[68] *See Badge of Fraud*, Black's Law Dictionary (11th ed. 2019) (defining "badge of fraud" as "[a] circumstance generally considered by courts as an indicator that a party to a transaction intended to hinder or defraud the other party, such as a transfer in anticipation of litigation, a transaction outside the usual course of business, or a false statement," and alternatively defining "badge of fraud" as "an indication of fraudulent intent"); *see also, e.g.*, *JPMorgan Chase Bank, N.A. v. Ballard*, 213 A.3d 1211, 1245 (Del. Ch. 2019) (inferring at pleading stage that defendants had intent to defraud based on "badges of fraud," including allegations that the "challenged payments largely were made to insiders" and that other suspicious circumstances surrounded the transactions), *appeal refused*, 214 A.3d 448 (Del. 2019) (TABLE); *Cooch v. Grier*, 59 A.2d 282, 287 (Del. Ch. 1948)

27

improve their viability, as the alleged "badges of fraud" do not support the elements of a claim for fraud for the reasons discussed above.

The Complaint thus fails to state a claim for common law fraud.

## 2.   The Complaint Fails to State a Claim for Equitable Fraud.

The parties did not separately address the equitable fraud claims. Yet, "[e]quitable fraud is separate from, and broader, than common law fraud."[69] "Whatever amounts to fraud, according to the legal conception, is also fraud in equitable conception; but the converse of this statement is not true."[70]

> It is utterly impossible to formulate any single statement which shall accurately define the equitable conception of fraud, and which shall contain all of the elements which enter into that conception; these elements are so various, so different under the different circumstances of equitable cognizance, so destitute of any common bond of unity, that they cannot be brought within any general formula. To

---

(identifying knowledge of the timing of a fraudulent conveyance as a "badge of fraud" permitting inference of intent to defraud); *Kirkley v. Lacey*, 30 A. 994, 995–96 (Del. Super. 1885) (instructing jury that if business was held in wife's name but funded by husband where husband sought to avoid business's liabilities, that would constitute a "badge of fraud" that would support proof of fraud); *see also United States v. Fernon*, 640 F.2d 609, 613 (5th Cir. 1981) ("[I]ntention [to defraud] can be found by the existence of certain indicia or badges of fraud. . . . '[W]hile a badge of fraud standing alone may amount to little more than a suspicious circumstance, insufficient in itself to constitute fraud per se, several of them when considered together may afford a basis from which its existence is properly inferable.'" (quoting *Banner Constr. Corp. v. Arnold*, 128 So. 2d 893, 896 (Fla. Dist. Ct. App. 1961))); *cf. Richards v. Jones*, 142 A. 832, 835 (Del. Ch. 1928) (describing a transfer from a son to his mother for nominal consideration as a badge of fraud permitting increased scrutiny of fairness of transaction because of higher possibility of fraud).

[69] *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 143 (Del. Ch. 2009).

[70] 3 John Norton Pomeroy, *A Treatise on Equity Jurisprudence* § 872, at 420 (5th ed. 1941).

28

attempt such a definition would therefore be not only useless, but actually misleading.[71]

"The flexibility of the doctrine of equitable fraud is necessary to allow courts of equity to address fraud in all of its forms, unhampered by the formalism that traditionally limited common law courts."[72] One of the ways in which this Court has loosened the formality of common law fraud has been by waiving the requirement to show *scienter*, "reflecting its willingness to provide a remedy for negligent or innocent misrepresentation."[73]

Decisions of this Court have held that "an equitable fraud . . . claim lies only if there is either: (i) a special relationship between the parties over which equity takes jurisdiction (like a fiduciary relationship) or (ii) justification for a remedy that only equity can afford."[74] In this case, Plaintiff alleged neither. Plaintiff and Defendants

---

[71] *Id.* § 873, at 420–21.

[72] *Airborne*, 984 A.2d at 144.

[73] *Id.* (internal quotation marks omitted); *see, e.g.*, *Zirn v. VLI Corp.*, 681 A.2d 1050, 1061 (Del. 1996); *Stephenson*, 462 A.2d at 1074 ("Equity courts developed their own requirements for relief from fraud. However, the only departure from the common law elements was Chancery's willingness to provide a remedy for negligent or innocent misrepresentations: the defendant did not have to know or believe that his statement was false or to have proceeded in reckless disregard of the truth."); *see also* Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 2.03[b][1][iii], at 2-36 to 2-37 (2d ed. 2019).

[74] *Fortis Advisors LLC v. Dialog Semiconductor PLC*, 2015 WL 401371, at *9 (Del. Ch. Jan. 30, 2015) (internal quotation marks omitted) (collecting cases); *see Airborne*, 984 A.2d at 144 ("Equitable fraud is not available in every case or to every plaintiff. It requires special equities, typically the existence of some form of fiduciary relationship, such as that between a director and stockholder or a trustee and *cestui que trust*, although other circumstances might be cited.").

29

were contracting parties who were incentivized to protect and monitor their individual rights memorialized in their agreements. They were not engaging in a relationship that imposed trust or confidence in one another. Plaintiff can seek an adequate remedy at law through its claims for breach of contract and specific performance.

The Complaint thus fails to state a claim for equitable fraud.

## E. Unjust Enrichment, Constructive Trust, and Equitable Lien

Plaintiff contends that Defendants were unjustly enriched and seeks relief through a constructive trust or equitable lien.[75] If an "express, enforceable contract . . . controls the parties' relationship . . . , a claim for unjust enrichment will be dismissed."[76] As the *Restatement (Third) of Restitution and Unjust Enrichment* explains, "[c]onsiderations of both justice and efficiency require that . . . the parties' own definition of their respective obligations—assuming the validity of their agreement by all pertinent tests—take precedence over the obligations that the law would impose in the absence of agreement."[77]

---

[75] Compl. ¶¶ 70–73 (Count IV).

[76] *Bakerman v. Sidney Frank Importing Co.*, 2006 WL 3927242, at *18 (Del. Ch. Oct. 10, 2006, revised Oct. 16, 2006); *accord Restatement (Third) of Restitution and Unjust Enrichment* § 2(2) (Am. L. Inst. 2011) ("A valid contract defines the obligations of the parties as to matters within its scope, displacing to that extent any inquiry into unjust enrichment.").

[77] *Restatement (Third) of Restitution and Unjust Enrichment* § 2 cmt. c.

Plaintiff argues that Defendants were unjustly enriched through a scheme to deprive Plaintiff of its share of the proceeds from the Sale. The conduct at issue is governed by the obligations in the Lease Agreement and Purchase Agreement. Because those agreements take precedence, the Complaint fails to state a claim for unjust enrichment.

The only basis Plaintiff offers to support the imposition of a constructive trust or equitable lien is unjust enrichment.[78] Thus, to the extent the Complaint seeks those forms of relief as a separate cause of action, it fails to state a claim.[79]

**F.    Veil Piercing**

Plaintiff claims that the Court should pierce Rommel Shell's veil to hold Rommel and Motorsports liable for Rommel Shell's failure to pay Plaintiff the proceeds from the Sale.[80]

---

[78] *See Hogg v. Walker*, 622 A.2d 648, 652 (Del. 1993) ("When one party, by virtue of fraudulent, unfair, or unconscionable conduct, is enriched at the expense of another to whom he or she owes some duty, a constructive trust will be imposed."); *Branca v. Branca*, 443 A.2d 929, 931 (Del. 1982) ("A principal reason for impressing an equitable lien is to prevent unjust enrichment, i.e., where it would be contrary to equity and good conscience for an individual to retain a property interest acquired at the expense of another."); *Vornado*, 821 A.2d at 322 ("For a court to impose a constructive trust, a plaintiff must demonstrate (1) a confidential or fiduciary relationship, (2) a promise, (3) a transfer in reliance on such promise, and (4) unjust enrichment." (internal quotation marks omitted)).

[79] Plaintiff contends that Defendants waived any argument for dismissing the claim for an equitable lien. Pl.'s Ans. Br. at 28. The request for an equitable lien rested upon Plaintiff's claim for unjust enrichment. Because Plaintiff failed to state that claim, the Court sees no reason to address the waiver argument.

[80] Compl. ¶ 78 (Count V).

Delaware public policy disfavors disregarding the separate legal existence of business entities.[81] Although a court considers several factors when determining whether to pierce the corporate veil,[82] courts have often articulated the elements of a veil piercing as requiring "an overall element of injustice or unfairness."[83]

---

[81] *Doberstein v. G-P Indus., Inc.*, 2015 WL 6606484, at *4 (Del. Ch. Oct. 30, 2015) ("Delaware public policy does not lightly disregard the separate legal existence of corporations . . . ." (internal quotation marks omitted)); *Wallace ex rel. Cencom Cable Income P'rs II, L.P. v. Wood*, 752 A.2d 1175, 1183 (Del. Ch. 1999) ("Persuading a Delaware court to disregard the corporate entity is a difficult task." (quoting *Harco Nat'l Ins. Co. v. Green Farms, Inc.*, 1989 WL 110537, at *4 (Del. Ch. Sept. 19, 1989))).

[82] *See, e.g., Doberstein*, 2015 WL 6606484, at *4 ("Specific facts a court may consider when being asked to disregard the corporate form include: (1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a facade for the dominant shareholder." (internal quotation marks omitted)).

[83] *Doberstein*, 2015 WL 6606484, at *4; *see Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003) ("To state a 'veil-piercing claim,' the plaintiff must plead facts supporting an inference that the corporation, through its alter-ego, has created a sham entity designed to defraud investors and creditors."); *Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 3337531, at *15 (Del. Ch. July 6, 2018) (dismissing veil-piercing claim that failed to allege facts supporting inference that corporation "exists solely as a vehicle for fraud"); *Gadsden v. Home Preserv. Co.*, 2004 WL 485468, at *4 (Del. Ch. Feb. 20, 2004, revised Mar. 12, 2004) ("A court of equity will disregard the separate legal existence of a corporation where it is shown that the corporate form has been used to perpetrate a fraud or similar injustice."); *Wallace*, 752 A.2d at 1184 (observing that veil piercing "'requires that the corporate structure cause fraud or similar injustice'" and that "[e]ffectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud" (quoting *Outokumpu Eng'g Enters., Inc. v. Kvaerner Enviropower, Inc.*, 685 A.2d 724, 729 (Del. Super. 1996))); *see also United States v. Golden Acres, Inc.*, 702 F. Supp. 1097, 1104 (D. Del. 1988) ("[N]o single factor could justify a decision to disregard the corporate entity, but . . . some combination of them [is] required, and . . . an overall element of injustice or unfairness must always be present . . . ."), *aff'd*, 879 F.2d 860 (3d Cir. 1989) (TABLE).

In this case, Plaintiff points to Defendants' alleged fraudulent activity as a basis for veil piercing. Plaintiff specifically alleges that (1) "[Rommell Shell] had no assets other than the net proceeds from the sale of the Property," (2) the distribution of those assets "was made at a time when [Rommell Shell was] aware of the financial obligation to pay [pursuant to its contractual obligations]," and (3) the "transfer of assets . . . was a sham transaction that existed for no purpose other than to defraud [Plaintiff]."[84] As discussed above, however, Plaintiff's allegations of fraud fail to state a claim. Plaintiff's other allegations amount to conclusory assertions insufficient to independently support a claim of veil piercing under the traditional multi-factor analysis.[85]

---

[84] Compl. ¶¶ 76, 77.

[85] *See Doberstein*, 2015 WL 6606484, at *4 (observing that "a plaintiff must do more than plead that one corporation is the alter ego of another in conclusory fashion" (internal quotation marks omitted)); *see also Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 5994971, at *6 (Del. Ch. Nov. 13, 2018) (denying reargument on pleading-stage dismissal of veil-piercing claim that consisted of "conclusory allegations of 'domination and control'"); *PR Acqs., LLC v. Midland Funding LLC*, 2018 WL 2041521, at *15 (Del. Ch. Apr. 30, 2018) (dismissing veil-piercing claim where complaint failed to plead facts that "suggest[ed] in any way that [company] dominates or controls [affiliate] or that [company] exists as a vehicle for [affiliate's] purported fraud"); *MicroStrategy Inc. v. Acacia Research Corp.*, 2010 WL 5550455, at *12 (Del. Ch. Dec. 30, 2010) (dismissing veil-piercing claim pled "in a conclusory fashion" where the complaint asserted that "the two corporations took actions that allegedly constitute breaches of contract and fraud without asserting any facts suggesting that such wrongs arose out of a 'misuse of the corporate structure'" (quoting *Medi-Tec of Egypt Corp. v. Bausch & Lomb Surgical*, 2004 WL 5366102, at *7 (Del. Ch. Mar. 4, 2004))).

Plaintiff further claims as part of its veil-piercing claim that Section 18-607 of the Delaware LLC Act provides an alternative route to recovery from Rommel and Motorsports.[86] Plaintiff, however, failed to meaningfully develop this argument, devoting a mere sentence to this issue in briefing,[87] and thus the motion to dismiss this aspect of Plaintiff's claim is also granted.[88]

---

[86] Compl. ¶¶ 75–76.

[87] Pl.'s Ans. Br. at 30.

[88] *In re Mobilactive Media, LLC*, 2013 WL 297950, at *12 n.152 (Del. Ch. Jan. 25, 2013) ("'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived . . . . It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work.'" (quoting *Roca v. E.I. du Pont de Nemours & Co.*, 842 A.2d 1238, 1242 n.12 (Del. 2004))). I also question the merits of this argument. By its plain language, Section 18-607 creates a corporate cause of action against LLC members who knowingly receive distributions that improperly strip an LLC of its assets so as to render the LLC insolvent. *See* 6 *Del. C.* § 18-607; Robert L. Symonds, Jr. & Matthew J. O'Toole, *Symonds & O'Toole on Delaware Limited Liability Companies* § 7.05[A], at 7-36 (2d ed. 2019). Under Delaware law, creditors lack standing to pursue derivative claims in the LLC context. *See CML V, LLC v. Bax*, 28 A.3d 1037, 1041 (Del. 2011). And on its face, Section 18-607 does not expose LLC members to claims brought by creditors, although such language could have been easily drafted. *Compare* 8 *Del. C.* § 174(a) (providing that "[i]n case of any willful or negligent violation of § 160 or § 173 of this title, the directors under whose administration the same may happen shall be jointly and severally liable . . . to the corporation *and to its creditors in the event of its dissolution or insolvency*, to the full amount of the dividend unlawfully paid, or the full amount unlawfully paid for the purchase or redemption of the corporation's stock" (emphasis added)), *with* 6 *Del. C.* § 18-607(b) (providing that "[a] member who receives a distribution in violation of subsection (a) of this section and who knew at the time of the distribution that the distribution violated subsection (a) of this section, shall be *liable to the limited liability company* for the amount of the distribution" (emphasis added)). Yet given the paucity of briefing on this issue, I am reluctant to weigh in on the merits of the argument here.

34

## III. CONCLUSION

Defendants' motion to dismiss is GRANTED in part and DENIED in part. Counts II, IV, and V are dismissed in their entirety. Count VI is dismissed as to the claim against Motorsports and Rommel for failure to ensure that Rommel Shell pursued commercially reasonable efforts to sell the Additional Space. In all other respects, the motion to dismiss is denied.